Jeffrey J. Gway & Lillian Q. Gway
5804 Tuquiose Avenue
Rancho Cucamonga, CA 91701

*Plaintiffs in Pro Per*

FILED
CLERK, U.S. DISTRICT COURT

JAN 2 0 2023

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION   N.f.   BY DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

Case No: **EDCV23-00099-** SSS-(SP)

JEFFREY J. GWAY & LILLIAN Q. G.WAY

     Plaintiff,

vs.

ZBS LAW, LLP C/O Michael Busby, Trustee Sale Officer and Rick Mroczek, Trustee Sale Officer, FAY SERVICING, LLC C/O CEO Edward Jay & Vice President Juliet Muller Mortgage Servicer, MORTGAGE ELECTRONIC REGISTRATION SYSTEM C/O R.K. Arnold, WFG NATIONAL-DEFAULT SEVICES Business Location unknown, M. C. Earle C/O by legal assistance for attorney new owner: Marlon T. Arias. all persons or entities unknown, claiming any legal or equitable right, title, estate, lien or interest in the property described in this Complaint adverse to Plaintiffs' title, or any cloud upon Plaintiffs' title & identity thereto.


    Defendant(s)

DOES 1-100

**VERIFIED COMPLAINT**

**CAUSES FOR ACTION/ DAMAGES:**

**PURSUANT TO TITLE 15 U.S.C §1681 (f) Prohibition on sale or transfer of debt caused by identity theft.**

**PURSUANT TO THE UNIFORM ELECTRONIC TRANSACTIONS ACT (UETA) TITLE 15 U.S.C §7003.**

**DEMAND FOR JURY TRIAL**

**Judges Name:** _____

**Court Room:** _____

## JURISDICTION

1.  This court has subject matter jurisdiction under 28 U.S.C § 1331. Federal question jurisdiction arises pursuant to 15 U.S.C. --§1681 (f) Prohibition on sale or transfer of debt caused by identity theft. Pursuant to the "UNIFORM ELECTRONIC TRANSACTIONS ACT (UETA) TITLE 15 U.S.C §7003.

-1-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VENUE**

2.  Venue is proper pursuant to 28 U.S.C § 1391 because the property at issue in this complaint is located in this district.

**PARTIES**

3.  Plaintiff's Jeffrey J. Gway & Lillian Q. Gway resides at 5804 Tuquiose Avenue, Rancho Cucamonga, CA 91701.

4.  Defendant (s) ZBS LAW, LLP C/O Michael Busby, Trustee Sale Officer and Rick Mroczek, Trustee Sale Officer Business Location: 30 Corporate Park, Suite #450, Irvine CA 92606.

5.  Defendant (s) FAY SERVICING, LLC C/O CEO Edward Jay & Vice President Juliet Muller Mortgage Servicer Business Location: 8001 Woodland Center Blvd, Suite #100, Tampa, FL 33614.

6.  Defendant (s) MORTGAGE ELECTRONIC REGISTRATION SYSTEM C/O R.K. Arnold Business Location: 8201 Greensboro Drive, Suite 350, Mclean, VA 22102.

7.  Defendant (s) WFG NATIONAL-DEFAULT SEVICES Business Location unknown.

8.  Defendant (s) M. C. Earle C/O by legal assistance for attorney new owner : Marlon T. Arias Business Location: 474 W. Orange Show Rd, San Bernardino, CA 92408.

**STATEMENT OF FACTS**

9.  On June 6, 2003 there was a Deed of Trust Contract signed by two parties Borrower: Jeffrey J. Gway & Lillian Q. Gway, Lender: Quicken Loans Inc. The Status of Quicken Loans, Inc with the California Secretary of State says the corporation status filed a certificate of surrender dated on April 15, 2020. California Law clearly defines that if an attorney or servicer or debt collector representing the now Surrendered Corporation, Dissolved Corporation, Suspended Corporation, in a litigation Defendant (s) risks state and federal penalties and possible disbarment by continuing to defend or prosecute claims on behalf of a Surrendered Corporation dated on April 15, 2020. Based upon the Department of Financial Protection & Innovation, dated on 8/5/2004 that QUICKEN LOANS, INC, License Status as a California

- 2 -

Residential Mortgage Lender, says inactive under license number 8138612, that means there could be absolutely no transfers or electronically recorded documents by the defendant (s). (*attached as Exhibits #1 and Deed of Trust Referencing QUICKEN LOANS, INC.*)

10.    On June 6, 2003 named inside the Deed of Trust is Mortgage Electronic Registration System clearly defines their position pursuant to Article 3 § 203 of the Uniform Commercial Code states that any note assigned by a person other then the issuer for enforcement purposes must transfer the full beneficial interest. Since MERS is not entitled to the Plaintiff's payments. MERS is not the issuer of the Plaintiff's Promissory Note Pursuant to Title 12 U.S.C Title 12 §1813 (l)(1). (*attached as Exhibit #2 and MERS TRADE MARK AGREEMENT.*)

11.    On 6/23/2022 Electronically filed a fraudulent document titled: (NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST) This was recorded by ZBS Law, LLP & WFG National-Default Services for the amount of $16, 014.38 as of 6/21/2022 Signed off by Rick Mroczek, Trustee Sale Officer the Attachment was a false forged California Declaration of Compliances signed off also by Vice President Julliet Muller of Fay Servicing, LLC Mortgage Servicer dated on 6/2/2022. To the Plaintiff's knowledge there was no contract to who they are in relations to Quicken Loans, Inc an entity that has surrendered on April 15, 2020. (*attached as Exhibit #3 Referencing QUICKEN LOANS, INC.CERTIFICATE OF SURRENDER & INACTIVE LENDER LICENCES.*)

12.    On 9/28/2022 Electronically filed by ZBS Law, LLP an illegal (NOTICE OF TRUSTEE SALE) This was done by Michael Busby, Trustee Sale Officer. There is no identifying record or credentials that ZBS Law, LLP or Fay Servicing LLC was employed by QUICKEN LOANS, INC, Plaintiff's ascertain this knowledge by comparing two set's of account number(s) the account number is different from QUICKEN LOANS, INC.; from the defendants. (*attached as Exhibit #4 Referencing THE FRAUDULENTLY ELECTRONIC FORGED(NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST UNDER THE NAME QUICKEN LOANS, INC.*)

13.    On 01/05/2023 Plaintiff's received an unauthorized illegal foreclosure letter titled 3/90-FORECLOSURE NOTICE TO QUIT from M.C Earle by legal assistant for attorney for new owner: Marlon T. Arias, without the consent of the surrendered Lender's approval Quicken Loans, Inc. or without a signed Delegation Order from the Foreclosure Commissioner Pursuant

to 12 U.S.C § 3706- Notice of default and foreclosure sale; condition and term of sale, This was all done electronically without the consent of the Plaintiff's knowledge. (*attached as Exhibit #5 Referencing THE FRAUDULENTLY ELECTRONIC FORGED(*(NOTICE OF TRUSTEE SALE *UNDER THE NAME QUICKEN LOANS, INC.*)

## CAUSES FOR ACTIONS/DAMAGES I

(Violation of Aggravated Identity Theft: No person shall sell, transfer for consideration, or place for collection a debt that such person has been notified under section 1681 c—2 of this title has resulted from identity theft.)

(4th and 14th Amendment/ 15 U.S.C  § **15 U.S.C §1681 (f)).**

14.  Plaintiff's realleges paragraphs 9 through 13. (*attached as Exhibit #6 Referencing Identity Theft Report to the FTC Report Number #154339529 with attached exhibits to the report FTC Statue & Title 12 Banks & Banking § (h) Identity theft* means a fraud committed or attempted using the identifying information of another person without authority.

*15.* By doing the acts described above in Paragraph 9 Defendant (s) caused and/or permitted the violation of Plaintiff's Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, thereby entitling Plaintiff's to recover damages pursuant to TITLE 15 U.S.C §1681 (f) Prohibition on sale or transfer of debt caused by identity theft: (1) No person shall sell, transfer for consideration, or place for collection a debt that such person has been notified under section 1681c---2 of this title has resulted from identity theft. "The constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decision-making when it acts to deprive a person of his possessions. The purpose of this requirement is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment—to minimize substantively unfair or mistaken deprivations of property, a danger that is especially great when the State seizes goods simply upon the application of and for the benefit of a private party. So viewed, the prohibition against the deprivation of property without due process of law reflects the high value, embedded in our constitutional and political history, that we place on a person's right to enjoy what is his, free of governmental interference. *Lynch v. Household Finance Corp., 405 U.S. 538.*

**CAUSES FOR ACTIONS/DAMAGES II**

(Violation of Uniform Electronic Transactions Act (UETA) USC § 15-96-1-7003:
(a) Excepted requirements The provisions of section 7001 of this title shall not
apply to a contract or other record to the extent it is governed by— (3) the Uniform
Commercial Code, as in effect in any State, other than sections 1–107 and 1–206
and Articles 2 and 2A.

(14th Amendment/ (UETA) TITLE 15 U.S.C §7003.))(*attachedas Exhibit #7 Referencing*
**the United States Statue At Large 106th Congress 1st Session HOUSE OF
REPRESENTATIVE Rept 106-341 Part 1 ELECTRONIC SIGNATURES IN GLOBAL
AND NATIONAL COMMERCE ACT (HR. 1714).**

16.  Plaintiff's realleges paragraphs 10 through 13. Sec. §112 – Statues at Large; contents
admissibility in evidence: The United States Statues at Large shall be legal evidence of laws,
concurrent resolutions, treaties, international agreements other than treaties, proclamations by
the President, and proposed or ratified amendments to the Constitution of the United States
therein contained, in all the courts of the United States, the several States, and the Territories
and insular possessions of the United States. .))( *attached as Exhibit #8 Referencing Sec 112.-
Statutes at Large; contents; admissibility in evidence.*

17.  By doing the acts described above in paragraph 10 through 13 Defendant (s) caused and/or
permitted the violation of Plaintiff's right to privacy guaranteed by the Fourteenth Amendment,
thereby entitling Plaintiff's to recover damages pursuant to Uniform Electronic Transactions
Act (UETA) USC § 15-96-1-7003: (a) Excepted requirements the provisions of section 7001 of this
title shall not apply to a contract or other record to the extent it is governed by— (3) the Uniform
Commercial Code. .))( *attached as Exhibit # 9 Referencing* --15 §1681 (f) Prohibition on sale or
transfer of debt caused by identity theft.

**REQUEST FOR RELIEF**

WHEREFORE, the Plaintiff's requests:

18.  Compensatory damages, including general and special damages according to proof and the
exhibits. There are two vital causes of actions that does not give the defendant (s) any motion for
failure to state claim upon which relief can be granted stated in plaintiff's complaint which would
be a procedural irregularities in the change of policy and procedures which would mean that this

1   complaint has properly alleged two causes of actions for the violations are identity theft and
2   without the consent of the plaintiff's there were no authorization of any electronic signature given
3   to each of the name defendant(s) to use the identities of both Plaintiff's on void contract that does
4   not authorize any claim or enforcement this would be automatically appealable.

5   19.   Any further relief such as sanctions or a restraining order from taking possession of
6   Plaintiff's property located at: 5804 Tuquiose Avenue, Rancho Cucamonga, CA 91701
7   which the court may deem appropriate.

8   **DEMAND FOR JURY TRIAL**

9
10  20.   Plaintiff's hereby requests a jury trial on all issues raised in this complaint.

11
    Dated:   1 - 20 - 2023
12

13
    By
14
          Jeffrey J. Gway Proper
15
    By:
16
          Lillian Q. Gway Proper
17

18

19

20

21

22

23

24

25

26

27

28

- 6 -

1

## **EXHIBIT LIST**

2

EXHIBIT (1) DEED OF TRUST

3

EXHIBIT (2) MERS TRADEMARK AGREEMENT

4

EXHIBIT (3) QUICKEN LOANS, INC.CERTIFICATE OF SURRENDER & INACTIVE

5

LENDER LICENCES

6

EXHIBIT (4) THE FRAUDULENTLY ELECTRONIC FORGED(NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST  UNDER THE NAME QUICKEN

7

LOANS, INC.)

8

EXHIBIT (5) THE FRAUDULENTLY ELECTRONIC FORGED((NOTICE OF TRUSTEE SALE UNDER THE NAME QUICKEN LOANS, INC.

9

EXHIBIT (6) Identity Theft Report to the FTC Report Number #154339529 with attached

10

exhibits to the report FTC Statue & Title 12 Banks & Banking § (h) Identity theft means a fraud committed or attempted using the identifying information of another person without authority..

11

EXHIBIT (7) United States Statue At Large 106th Congress 1st Session HOUSE OF

12

REPRESENTATIVE Rept 106-341 Part 1 ELECTRONIC SIGNATURES IN GLOBAL AND NATIONAL COMMERCE ACT (HR. 1714).

13

EXHIBIT (8) Sec 112.- Statutes at Large; contents; admissibility in evidence.

14

EXHIBIT (B) IRS 14039 IRS IDENTITY THEFT

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 1

*Orange Coast Title Co.*

b.

Recording Requested By:
See 'Return To:' name

Return To:
Kim Majestic
Quicken Loans Inc.
20555 Victor Parkway
Livonia, MI 48152

Prepared By:
Angenette Graham

Recorded in Official Records, County of San Bernardino

**LARRY WALKER**
Auditor/Controller — Recorder

613 Cal Hall/Placer

Doc#: 2003 - 0408381

| | |
|---|---|
| 6/18/2003 8:00 AM MA | |
| Titles: 1 | Pages: 17 |
| Fees | 56.00 |
| Taxes | 0.00 |
| Other | 0.00 |
| PAID | ₩56.00 |



———————[Space Above This Line For Recording Data]———————

# DEED OF TRUST

4671692751

MIN 100039046716927518

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated        June 6, 2003        ,
together with all Riders to this document.
**(B) "Borrower"** is Jeffrey J. Gway and Lillian Q. Gway, husband and wife, as joint tenants

Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is Quicken Loans Inc.

Lender is a
organized and existing under the laws of        Corporation
                                               the State of Michigan

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3005 1/01

-6A(CA) (0005)   167324270
Page 1 of 15        Initials:
VMP MORTGAGE FORMS - (800)521-7291

4671692751233D

Lender's address is 20555 Victor Parkway, Livonia, MI  48152

**(D)** "**Trustee**" is ORANGE COAST TITLE CO.

**(E)** "**MERS**" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument**. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F)** "**Note**" means the promissory note signed by Borrower and dated   June 6, 2003
The Note states that Borrower owes Lender Two Hundred Sixty Nine Thousand and
00/100                                                                                          Dollars
(U.S. $269,000.00           ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than      July 1, 2033          .

**(G)** "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

**(H)** "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I)** "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(J)** "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K)** "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L)** "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M)** "**Escrow Items**" means those items that are described in Section 3.

**(N)** "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)** "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)** "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

-6A(CA) (0005)                         Page 2 of 15                    Initials:            Form 3005  1/01

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

County                          of                San Bernardino                 :

[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF. SUBJECT TO COVENANTS OF RECORD.

Parcel ID Number:                                       which currently has the address of
5804 Turquoise Ave                                                              [Street]
          Rancho Cucamonga
                                          [City], California 91701             [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

VMP®-6A(CA) (0005)                    Page 3 of 15                            Form 3005  1/01

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

-6A(CA) (0005)                          Page 4 of 15                    Initials           Form 3005   1/01

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

-6A(CA) (0005)                Page 6 of 15         Initials         Form 3005   1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-6A(CA) (0005)                    Page 7 of 15                         Form 3005   1/01

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

-6A(CA) (0005)                    Page 9 of 15                    Initials ___    Form 3005  1/01

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

-6A(CA) (0005)     Page 11 of 15     Form 3005  1/01

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

-6A(CA) (0005)                    Page 12 of 15                    Initials    Form 3005  1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

-6A(CA) (0005)                        Page 13 of 15                Initials                        Form 3005  1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____    _____ 06/06/2003 __ (Seal)
                             Jeffrey J. Gway                          -Borrower

_____    _____ 06/06/2003 __ (Seal)
                             Lillian Q Gway                           -Borrower

_____ (Seal)     _____ (Seal)
                     -Borrower                                   -Borrower

_____ (Seal)     _____ (Seal)
                     -Borrower                                   -Borrower

_____ (Seal)     _____ (Seal)
                     -Borrower                                   -Borrower

-6A(CA) (0005)                    Page 14 of 15                    Form 3005   1/01

State of California
County of          San Bernardino                    } ss.

On          June 6, 2003          before me,  *Melinda Reinelt, Notary Public*
                                                              personally appeared
Jeffrey J. Gway and Lillian Q. Gway, husband and wife, as joint
tenants

, ~~personally known to me~~
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

```
MELINDA REINELT
COMM. #1262786
Notary Public-California
SAN BERNARDINO COUNTY
My Comm. Exp. May 5, 2004
```

Melinda Reinelt
Comm. # 1262786
my Comm. Exp. May 5, 2004

-6A(CA) (0005)                    Page 15 of 15                    Form 3005  1/01

4671692751

# Notification of Equity Line Payoff

| Borrower Name(s): | Lein Holder: |
|---|---|
| Jeffrey J. Gway<br>Lillian Q Gway | WASHINGTON MUTUAL BANK |
| **Property Address:**<br>5804 Turquoise Ave<br>Rancho Cucamonga, CA 91701 | **Attention: Payoff Department** |
| | **Re**<br>12079045000000 |

June 5, 2003

Enclosed you will find a check for final payment for the above referenced account. If this is a future advance mortgage or a home equity line of credit, this letter authorizes you to **close the loan in full** and release the lien on the subject property.

Sincerely,

_____     06/06/2003
Jeffrey J. Gway                 Date

_____     06/06/2003
Lillian Q Gway                 Date

4671692751283

2002/11r    closeout.pcl

167324832      200001.00

Order No. Y14124-16

## Exhibit "A"

Lot 3 of tract 9540, in the City of Rancho Cucamonga, County of San Bernardino, State of California, as per map recorded in book 147, page(s) 56 and 57, of maps, in the office of the County Recorder of said County.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 2

D

FORM PTO-1618A
Expires 06/30/99
OMB 0651-0027

08-27-1998

||||||||||||||||||

100804608

U.S. Department of Commerce
Patent and Trademark Office
**TRADEMARK**

U.S. Patent & TMOfc/TM Mail Rcpt Dt. #70

||||||||||||||||||
08-10-1998

**RECORDATION FORM COVER SHEET**
**TRADEMARKS ONLY**

TO: The Commissioner of Patents and Trademarks: Please record the attached original document(s) or copy(ies).

| Submission Type | Conveyance Type |
|---|---|
| [X] New | [ ] Assignment  [ ] License |
| [ ] Resubmission (Non-Recordation) Document ID # | [X] Security Agreement  [ ] Nunc Pro Tunc Assignment |
| [ ] Correction of PTO Error Reel #  Frame # | [ ] Merger  Effective Date Month Day Year |
| [ ] Corrective Document Reel #  Frame # | [ ] Change of Name |
|  | [ ] Other |

**Conveying Party**                    [ ] Mark if additional names of conveying parties attached    Execution Date Month Day Year

Name  Mortgage Electronic Registration Systems, Inc.        06 30 98

Formerly

[ ] Individual   [ ] General Partnership   [ ] Limited Partnership   [X] Corporation   [ ] Association

[ ] Other

[X] Citizenship/State of Incorporation/Organization   Delaware

**Receiving Party**                    [ ] Mark if additional names of receiving parties attached

Name  NationsBank, N.A.

DBA/AKA/TA

Composed of

Address (line 1)  8300 Greensboro Drive

Address (line 2)  Suite 550

Address (line 3)  McLean          VA          22102
                   City         State/Country      Zip Code

[ ] Individual   [ ] General Partnership   [ ] Limited Partnership   If document to be recorded is an assignment and the receiving party is not domiciled in the United States, an appointment of a domestic representative should be attached. (Designation must be a separate document from assignment.)

[ ] Corporation   [ ] Association

[X] Other   National Banking Association

[X] Citizenship/State of Incorporation/Organization   U.S.

FOR OFFICE USE ONLY

Public burden reporting for this collection of information is estimated to average approximately 30 minutes per Cover Sheet to be recorded, including time for gathering the document and gathering the data needed to complete the Cover Sheet. Send comments regarding this burden estimate to the U.S. Patent and Trademark Office, Chief Information Officer, Washington, D.C. 20231 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Paperwork Reduction Project (0651-0027), Washington, D.C. 20503. See OMB Information Collection Budget Package 0651-0027, Patent and Trademark Assignment Practice. DO NOT SEND REQUESTS TO RECORD ASSIGNMENT DOCUMENTS TO THIS ADDRESS.

Mail documents to be recorded with required cover sheet(s) information to:
Commissioner of Patents and Trademarks, Box Assignments , Washington, D.C. 20231

FORM PTO-1618B
Expires 06/30/99
OMB 0651-0027

**Page 2**

U.S. Department of Commerce
Patent and Trademark Office
**TRADEMARK**

**Domestic Representative Name and Address** — Enter for the first Receiving Party only.

Name

Address (line 1)

Address (line 2)

Address (line 3)

Address (line 4)

**Correspondent Name and Address** — Area Code and Telephone Number (757) 518-3206

Name    R. Joel Ankney

Address (line 1)    P.O. Box 61185

Address (line 2)    Virginia Beach, VA 23466-1185

Address (line 3)

Address (line 4)

**Pages** — Enter the total number of pages of the attached conveyance document including any attachments.    # 18

**Trademark Application Number(s) or Registration Number(s)** — Mark if additional numbers attached

Enter either the Trademark Application Number or the Registration Number (DO NOT ENTER BOTH numbers for the same property).

| Trademark Application Number(s) | | | Registration Number(s) | | |
|---|---|---|---|---|---|
| | | | 2084831 | | |
| | | | | | |
| | | | | | |

**Number of Properties** — Enter the total number of properties involved.    # 1

**Fee Amount** — Fee Amount for Properties Listed (37 CFR 3.41):    $ 40.00

Method of Payment:    Enclosed [X]    Deposit Account [ ]

**Deposit Account**
(Enter for payment by deposit account or if additional fees can be charged to the account.)

Deposit Account Number:    #

Authorization to charge additional fees:    Yes [ ]    No [ ]

**Statement and Signature**

To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document. Charges to deposit account are authorized, as indicated herein.

R. Joel Ankney
**Name of Person Signing**

_signature_
**Signature**

August 6, 1998
**Date Signed**

TRADEMARK
REEL: 1773 FRAME: 0950

## SECURITY AGREEMENT

This SECURITY AGREEMENT (as amended, supplemented or modified from time to time, this "Security Agreement") is dated as of June 30, 1998 and is between MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a Delaware corporation (the "Borrower"), and NATIONSBANK, N.A., a national banking association (the "Bank").

The Borrower and the Bank propose to enter into a Secured Credit Agreement dated as of June 30, 1998 (as the same may be amended, supplemented or modified from time to time and including any agreement extending the maturity of, refinancing or otherwise restructuring all or any portion of the Obligations under such Agreement or any successor agreement, the "Credit Agreement"). To induce the Bank to enter into the Credit Agreement and to secure its obligations thereunder and hereunder, the Borrower hereby agrees with the Bank as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1. **Defined Terms.** As used in this Security Agreement, terms defined in the Credit Agreement shall have their defined meanings when used herein, and the following terms shall have the following meanings:

"Account Debtor" means, with respect to any Receivable or Other Intangible, any Person obligated to make payment thereunder, including without limitation any account debtor thereon.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of the Commonwealth of Virginia.

"Collateral" has the meaning assigned to it in Section 2.1 of this Security Agreement.

"Equipment" means all equipment now owned or hereafter acquired by the Borrower, including all items of machinery, equipment, furnishings and fixtures of every kind, whether affixed to real property or not, as well as all automobiles, trucks and vehicles of every description, trailers, handling and delivery equipment, all additions to, substitutions for, replacements of or accessions to any of the foregoing, all attachments, components, parts (including space parts) and accessories whether installed thereon or affixed thereto and all fuel for any thereof.

"Inventory" means all inventory now owned or hereafter acquired by the Borrower, including (i) all goods and other personal property which are held for sale or lease or are furnished or are to be furnished under a contract of service or which constitute raw materials, work in process or materials used or consumed or to be used or consumed in the Borrower's business, (ii) all inventory, wherever located, evidenced by negotiable and non-negotiable documents of title, warehouse receipts and bills of lading, (iii) all of the Borrower's rights in, to and under all purchase orders now owned or hereafter received or acquired by it for goods or services and (iv) all rights of the Borrower as an unpaid seller, including rescission, replevin, reclamation and stopping in transit.

"License" means, with respect to any Patent, any agreement granting any right to practice any invention covered by any Patent and, with respect to any Trademark, any agreement granting any right to use any Trademark, and "Licenses" means all of such Licenses.

"Obligations" means (i) all amounts now or hereafter payable by the Borrower to the Bank on the Note, (ii) all other obligations or liabilities now or hereafter payable by the Borrower pursuant to the Credit Agreement, (iii) all obligations and liabilities now or hereafter payable by the Borrower under, arising out of or in connection with this Security Agreement or any other Loan Document and (iv) all other indebtedness, obligations and liabilities of the Borrower to the Bank, now existing or hereafter arising or incurred, whether or not evidenced by notes or other instruments, and whether such indebtedness, obligations and liabilities are direct or indirect, fixed or contingent, liquidated or unliquidated, due or to become due, secured or unsecured, joint, several or joint and several, related or unrelated to the Loans, similar or dissimilar to the indebtedness arising out of or in connection with the Credit Agreement or of the same or a different class of indebtedness as the

- 1 -

TRADEMARK
REEL: 1773 FRAME: 0951

indebtedness arising out of or in connection with the Credit Agreement, including, without limitation, any overdrafts in any deposit accounts maintained by the Borrower with the Bank, all obligations of the Borrower with respect to letters of credit, if any, issued by the Bank for the account of the Borrower, any indebtedness of the Borrower that is purchased by or assigned to the Bank and any indebtedness of the Borrower to any assignee of all or a portion of the Notes or any other obligation referred to in this definition.

"Other Intangibles" means all accounts, accounts receivable, contract rights, documents, instruments, chattel paper, money and general intangibles now owned or hereafter acquired by the Borrower including, without limitation, all customer lists, permits, federal and state tax refunds, reversionary interests in pension plan assets, Trademarks, Patents, Licenses, copyrights and other rights in intellectual property, other than Receivables.

"Patent" means all letters patent of the United States or any other country, and all applications for letters patent of the United States or any other country, in which the Borrower may now or hereafter have any right, title or interest and all reissues, continuations, continuations-in-part or extensions thereof.

"Proceeds" means all proceeds, including (i) whatever is received upon any collection, exchange, sale or other disposition of any of the Collateral and any property into which any of the Collateral is converted, whether cash or non-cash, (ii) any and all payments or other property (in any form whatsoever) made or due and payable on account of any insurance, indemnity, warranty or guaranty payable to the Borrower with respect to any of the Collateral, (iii) any and all payments (in any form whatsoever) made or due and payable in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental body, authority, bureau or agency (or any person, corporation, agency, authority or other entity acting under color of any governmental authority), (iv) any claim of the Borrower against third parties for past, present or future infringement of any Patent or for past, present or future infringement or dilution of any Trademark or for injury to the goodwill associated with any Trademark or for the breach of any License and (v) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Real Estate" means all real property and all buildings, plants, furnishing or fixtures or other improvements to or construction on real property now owned or hereafter acquired by the Borrower, and all leasehold interests now owned or hereafter acquired by the Borrower in real property.

"Receivables" means all accounts now or hereafter owing to the Borrower, and all accounts receivable, contract rights, documents, instruments or chattel paper representing amounts payable or monies due or to become due to the Borrower, arising from the sale of Inventory or the rendition of services in the ordinary course of business or otherwise (whether or not earned by performance), together with all Inventory returned by or reclaimed from customers wherever such Inventory is located, and all guaranties, securities and liens held for the payment of any such account, account receivable, contract right, document, instrument or chattel paper.

"Trademark" means all right, title or interest which the Borrower may now or hereafter have in any or all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos, other source of business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registration and recordings thereof and all applications in connection therewith, including without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or political subdivision thereof and all reissues, extensions or renewals thereof.

"UCC" means at any time the Uniform Commercial Code as the same may from time to time be in effect in the Commonwealth of Virginia, provided that, if, by reason of mandatory provisions of law, the validity or perfection of any security interest granted herein is governed by the Uniform Commercial Code as in effect in a jurisdiction other than Virginia then, as to the validity or perfection of such security interest, "UCC" shall mean the Uniform Commercial Code in effect in such other jurisdiction.

-2-

TRADEMARK
REEL: 1773 FRAME: 0952

**Section 1.2. UCC Definitions.** The uncapitalized terms "account", "account debtor", "chattel paper", "contract right", "document", "warehouse receipt", "bill of lading", "document of title", "instrument", "inventory", "equipment" "general intangible", "money", "proceeds" and "purchase money security interest" as used in Section 1.1 or elsewhere in this Agreement have the meanings of such terms as defined in the UCC.

## ARTICLE II
### SECURITY INTERESTS

**Section 2.1. Grant of Security Interests.** To secure the due and punctual payment of all Obligations, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing or due or to become due, in accordance with the terms thereof and to secure the due and punctual performance of all of the obligations of the Borrower contained in the Credit Agreement and in the other Loan Documents to which it is a party and in order to induce the Bank to enter into the Credit Agreement and make the loans provided for therein in accordance with the terms thereof, the Borrower hereby grants to the Bank a security interest in all of the Borrower's right, title and interest in, to and under the following, whether now existing or hereafter acquired (all of which are herein collectively called the "Collateral"):

    (i)    all Receivables;

    (ii)    all Other Intangibles;

    (iii)    all Equipment;

    (iv)    all Inventory;

    (v)    to the extent not included in the foregoing, all other personal property, whether tangible or intangible, and wherever located, including, but not limited to, the balance of every deposit account now or hereafter existing of the Borrower with any bank and all monies of the Borrower and all rights to payment of money of the Borrower;

    (vi)    to the extent not included in the foregoing, all books, ledgers and records and all computer programs, tapes, discs, punch cards, data processing software, transaction files, master files and related property and rights (including computer and peripheral equipment) necessary or helpful in enforcing, identifying or establishing any item of Collateral; and

    (vii)    to the extent not otherwise included, all Proceeds and products of any or all of the foregoing, whether existing on the date hereof or arising hereafter.

**Section 2.2. Continuing Liability of the Borrower.** Anything herein to the contrary notwithstanding, the Borrower shall remain liable to observe and perform all the terms and conditions to be observed and performed by it under any contract, agreement, warranty or other obligation with respect to the Collateral, and shall do nothing to impair the security interests herein granted. The Bank shall not have any obligation or liability under any such contract, agreement, warranty or obligation by reason of or arising out of this Security Agreement or the receipt by the Bank of any payment relating to any Collateral, nor shall the Bank be required to perform or fulfill any of the obligations of the Borrower with respect to the Collateral, to make any inquiry as to the nature or sufficiency of any payment received by it or the sufficiency of the performance of any party's obligations with respect to any Collateral. Furthermore, the Bank shall not be required to file any claim or demand to collect any amount due or to enforce the performance of any party's obligations with respect to, the Collateral.

TRADEMARK
REEL: 1773 FRAME: 0953

## Section 2.3.  Sales and Collections.

(a)    The Borrower is authorized (i) to sell in the ordinary course of its business for fair value and on an arm's-length basis any of its Inventory normally held by it for such purpose and (ii) to use and consume, in the ordinary course of its business, any raw materials, supplies and materials normally held by it for such purpose.  The Bank may upon the occurrence of any Event of Default, without cause or notice, curtail or terminate such authority at any time.

(b)    The Borrower is authorized to collect amounts owing to it with respect to the Collateral.  However, the Bank at any time, upon the occurrence of a Default, notify Account Debtors obligated to make payments under any or all Receivables or Other Intangibles that the Bank has a security interest in such Collateral and that payments shall be made directly to the Bank.  Upon the request of the Bank at any time upon the occurrence of a Default, the Borrower will so notify such account debtors.  The Borrower will use all reasonable efforts to cause each account debtor to comply with the foregoing instruction.  In furtherance of the foregoing, the Borrower authorizes the Bank (i) to ask for, demand, collect, receive and give acquittances and receipts for any and all amounts due and to become due under any Collateral and, in the name of the Borrower or its own name or otherwise, (ii) to take possession of, endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Collateral and (iii) to file any claim or take any other action in any court of law or equity or otherwise which it may deem appropriate for the purpose of collecting any amounts due under any Collateral.  The Bank shall have no obligation to obtain or record any information relating to the source of such funds or the obligations in respect of which payments have been made.

## Section 2.4.  Segregation of Proceeds.

(a)    The Bank shall have the right at any time upon the occurrence of a Default to cause to be opened and maintained at the principal office of the Bank a non-interest bearing bank account (the "Cash Collateral Account") which will contain only Proceeds.  Any cash proceeds (as such term is defined in Section 9-306(1) of the UCC) received by the Bank directly from Account Debtors obligated to make payments under Receivables or Other Intangibles pursuant to Section 2.3 or from the Borrower pursuant to clause (b) of this Section 2.4, whether consisting of checks, notes, drafts, bills of exchange, money orders, commercial paper or other Proceeds received on account of any Collateral, shall be promptly deposited in the Cash Collateral Account, and until so deposited shall be held in trust for and as the Bank's property and shall not be commingled with any funds of the Borrower not constituting Proceeds of Collateral.  The name in which the Cash Collateral Account is carried shall clearly indicate that the funds deposited therein are the property of the Borrower, subject to the security interest of the Bank hereunder.  Such Proceeds, when deposited, shall continue to be security for the Obligations and shall not constitute payment thereof until applied as hereinafter provided.  The Bank shall have sole dominion and control over the funds deposited in the Cash Collateral Account, and such funds may be withdrawn therefrom only by the Bank; provided, however, that until a Default shall occur, all collected funds on deposit in the Cash Collateral Account, or so much thereof as is not required to make payment of the Obligations which have become due and payable, shall be withdrawn by the Bank on the Business Day next following the day on which the Bank considers the funds deposited therein to be collected funds and disbursed to the Borrower or its order.

(b)    Upon notice by the Bank to the Borrower that the Cash Collateral Account has been opened, the Borrower shall cause all cash Proceeds collected by it to be delivered to the Bank forthwith upon receipt, in the original form in which received (with such endorsements or assignments as may be necessary to permit collection thereof by the Bank), and for such purpose the Borrower hereby irrevocably authorizes and empowers the Bank, its officers, employees and authorized agents to endorse and sign the name of the Borrower on all checks, drafts, money orders or other media of payment so delivered, and such endorsements or assignments shall, for all purposes, be deemed to have been made by the Borrower prior to any endorsement or assignment thereof by the Bank.  The Bank may use any convenient or customary means for the purpose of collecting such checks, drafts, money orders or other media of payment.

Section 2.5.  Verification of Receivables.  The Bank shall have the right to make test verifications of Receivables in any manner and through any medium that it considers advisable, and the Borrower agrees to furnish all such assistance and information as the Bank may require in connection

4

TRADEMARK
REEL: 1773 FRAME: 0954

therewith. The Borrower at its expense will cause its chief financial officer to furnish to the Bank at any time and from time to time promptly upon the Bank's request, the following reports: (i) a reconciliation of all Receivables, (ii) an aging of all Receivables, (iii) trial balances and (iv) a test verification of such Receivables as the Bank may request.

### Section 2.6.  Release of Collateral.

(a)    The Borrower may sell or realize upon or transfer or otherwise dispose of Collateral as permitted by Section 4.13, and the security interests of the Bank in such Collateral so sold, realized upon or disposed of (but not in the Proceeds arising from such sale, realization or disposition) shall cease immediately upon such sale, realization or disposition, without any further action on the part of the Bank. The Bank, if requested in writing by the Borrower but at the expense of the Borrower, is hereby authorized and instructed to deliver to the Account Debtor or the purchaser or other transferee of any such Collateral a certificate stating that the Bank no longer has a security interest therein, and such Account Debtor or such purchaser or other transferee shall be entitled to rely conclusively on such certificate for any and all purposes.

(b)    Upon the payment in full of all of the Obligations by the Borrower and if there is no commitment by the Bank to make further advances, incur obligations or otherwise give value, the Bank will (as soon as reasonably practicable after receipt of notice from the Borrower requesting the same but at the expense of the Borrower) send the Borrower, for each jurisdiction in which a UCC financing statement is on file to perfect the security interests granted to the Bank hereunder, a termination statement to the effect that the Bank no longer claims a security interest under such financing statement.

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants that:

### Section 3.1.  Validity of Security Agreement; Consents.  The execution, delivery and performance of this Security Agreement and the creation of the security interests provided for herein (i) are within the Borrower's corporate power, (ii) have been duly authorized by all necessary corporate action, including the consent of shareholders where required, on behalf of the Borrower, (iii) are not in contravention of any provision of the Borrower's articles of incorporation or by-laws, (iv) do not violate any law or regulation or any order or decree of any court or governmental instrumentality applicable to the Borrower, (v) do not conflict with or result in a breach of, or constitute a default under, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which the Borrower is a party or by which it or any of its properties is bound, (vi) do not result in the creation or imposition of any Lien upon any property of the Borrower other than in favor of the Bank and (vii) do not require the consent or approval of any governmental body, agency or official or other person other than those that have been obtained. This Security Agreement has been duly executed and delivered by the Borrower and constitutes the legal, valid and binding obligation of the Borrower, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or affecting the enforceability of creditors' rights generally and by general provisions of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

### Section 3.2.  Title to Collateral.  Except for the security interests granted to the Bank pursuant to this Security Agreement, the Borrower is the sole owner of each item of the Collateral, having good and marketable title thereto, free and clear of any and all Liens, except Permitted Liens.

### Section 3.3.  Validity, Perfection and Priority of Security Interests.

(a)    By complying with Section 4.1, the Borrower will have created a valid security interest in favor of the Bank in all existing Collateral and in all identifiable Proceeds of such Collateral, which security interest (except in respect of motor vehicles for which the exclusive manner of perfecting a security interest therein is by noting such security interest in the certificate of title in accordance with local law) would be prior to the claims of a trustee in bankruptcy under Section 544(a) of the United States federal Bankruptcy Code. Continuing compliance by the Borrower with the

-5-

TRADEMARK
REEL: 1773 FRAME: 0955

provisions of Section 4.2 will also (i) create valid security interests in all Collateral acquired after the date hereof and in all identifiable Proceeds of such Collateral and (ii) cause such security interests in all Collateral and in all Proceeds which are (A) identifiable cash Proceeds of Collateral covered by financing statements required to be filed hereunder, (B) identifiable Proceeds in which a security interest may be perfected by such filing under the UCC and (C) any Proceeds in the Cash Collateral Account to be duly perfected under the UCC, in each case prior to the claims of a trustee in bankruptcy under the United States federal Bankruptcy Code.

(b)     The security interests of the Bank in the Collateral rank first in priority, except that the priority of the security interests may be subject to Permitted Liens.  Other than financing statements or other similar documents perfecting the security interests or deed of trust liens of the Bank, no financing statements, deeds of trust, mortgages or similar documents covering all or any part of the Collateral are on file or of record in any government office in any jurisdiction in which such filing or recording would be effective to perfect a security interest in such Collateral, nor is any of the Collateral in the possession of any Person (other than the Borrower) asserting any claim thereto or security interest therein.

Section 3.4.  Enforceability of Receivables and Other Intangibles.  To the best knowledge of the Borrower, each Receivable and Other Intangible is a valid and binding obligation of the related Account Debtor in respect thereof, enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general provisions of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), and complies with any applicable legal requirements.

Section 3.5.  Place of Business; Location of Collateral.  Schedule 1 correctly sets forth the Borrower's chief executive office and principal place of business of the Borrower and the offices of the Borrower where records concerning Receivables and Other Intangibles are kept. Schedule 2 correctly sets forth the location of all Equipment and Inventory, other than rolling stock, aircraft, goods in transit and Inventory sold in the ordinary course of business as permitted by Section 4.13 of this Security Agreement.  Except as otherwise specified in Schedule 2, all Inventory and Equipment has been located at the address specified on Schedule 2 at all times during the four-month period prior to the date hereof while owned by the Borrower.  All Inventory has been and will be produced in compliance with the Fair Labor Standards Act, 29 U.S.C. §§ 201-219.  No Inventory is evidenced by a negotiable document of title, warehouse receipt or bill of lading.  No non-negotiable document of title, warehouse receipt or bill of lading has been issued to any person other than the Borrower, and the Borrower has retained possession of all of such non-negotiable documents, warehouse receipts and bills of lading.  No amount payable under or in connection with any of the Collateral is evidenced by promissory notes or other instruments.  The real estate listed in Schedule 3 constitutes all existing Real Estate.

Section 3.6.  Trade Names.  Any and all trade names, division names, assumed names or other names under which the Borrower transacts, or within the four-month period prior to the date hereof has transacted, business are specified on Schedule 4.

## ARTICLE IV
## COVENANTS

The Borrower covenants and agrees with the Bank that until the payment in full of all Obligations and until there is no commitment by the Bank to make further advances, incur obligations or otherwise give value, the Borrower will comply with the following.

Section 4.1.  Perfection of Security Interests.  The Borrower will, at its expense, cause all filings and recordings and other actions specified on Schedule 5 to have been completed on or prior to the date of the first Loan under the Credit Agreement.

TRADEMARK
REEL: 1773 FRAME: 0956

### Section 4.2.  Further Actions.

(a)    At all times after the date of the first Loan under the Credit Agreement, the Borrower will, at its expense, comply with the following:

(i)    as to all Receivables, Other Intangibles, Equipment and Inventory, it will cause UCC financing statements and continuation statements to be filed and to be on file in all applicable jurisdictions as required to perfect the security interests granted to the Bank hereunder, to the extent that applicable law permits perfection of a security interest by filing under the UCC;

(ii)    as to all Proceeds, it will cause all UCC financing statements and continuation statements filed in accordance with clause (i) above to include a statement or a checked box indicating that Proceeds of all items of Collateral described therein are covered;

(iii)    upon the request of the Bank, it will ensure that the provisions of Section 2.4 are complied with;

(iv)    as to any amount payable under or in connection with any of the Collateral which shall be or shall become evidenced by any promissory note or other instrument, the Borrower will immediately pledge and deliver such note or other instrument to the Bank as part of the Collateral, duly endorsed in a manner satisfactory to the Bank;

(v)    as to all Real Estate acquired after the date hereof, the Borrower will execute and record such additional mortgages, deeds of trust or other real estate security documents in such form as shall be satisfactory to the Bank so as to create a valid first priority lien thereon in favor of the Bank; and

(vi)    as to all Patents, Patent Licenses, Trademarks or Trademark Licenses, the Borrower will effect the recordation or renewal of the recordation of the security interests of the Bank therein so as to maintain valid and perfected security interests therein under all applicable state and United States federal laws.

(b)    The Borrower will, from time to time and at its expense, execute, deliver, file or record such financing statements pursuant to the Uniform Commercial Code, applications for certificates of title and such other statements, assignments, instruments, documents, agreements or other papers and take any other action that may be necessary or desirable, or that the Bank may reasonably request, in order to create, preserve, perfect, confirm or validate the security interests, to enable the Bank to obtain the full benefits of this Security Agreement or to enable it to exercise and enforce any of its rights, powers and remedies hereunder, including, without limitation, its right to take possession of the Collateral, and will use its best efforts to obtain such waivers from landlords and mortgagees as the Bank may request.

(c)    To the fullest extent permitted by law, the Borrower authorizes the Bank to sign and file financing and continuation statements and amendments thereto with respect to the Collateral without its signature thereon.

### Section 4.3.  Change of Name, Identity or Structure.

The Borrower will not change its name, identity or corporate structure in any manner and, except as set forth on Schedule 4, will not conduct its business under any trade, assumed or fictitious name unless it shall have given the Bank at least thirty days' prior written notice thereof and shall have taken all action (or made arrangements to take such action substantially simultaneously with such change if it is impossible to take such action in advance) necessary or reasonably requested by the Bank to amend any financing statement or continuation statement relating to the security interests granted hereby in order to preserve such security interests and to effectuate or maintain the priority thereof against all Persons.

### Section 4.4.  Place of Business and Collateral.

The Borrower will not change the location of (i) its places of business, (ii) its chief executive office or (iii) the office or other locations

-7-

where it keeps or holds any Collateral or any records relating thereto from the applicable location listed on Schedule 1 or 2 hereto unless, prior to such change, it notifies the Bank of such change, makes all UCC filings required by Section 4.2 and takes all other action necessary or that the Bank may reasonably request to preserve, perfect, confirm and protect the security interests granted hereby. The Borrower will in no event change the location of any Collateral if such change would cause the security interest granted hereby in such Collateral to lapse or cease to be perfected. The Borrower will at all times maintain its chief executive office within one of the forty-eight contiguous states in which Article 9 of the UCC is in effect.

Section 4.5. **Fixtures.** The Borrower will not permit any Equipment to become a fixture unless it shall have given the Bank at least ten days' prior written notice thereof and shall have taken all such action and delivered or caused to be delivered to the Bank all instruments and documents, including, without limitation, waivers and subordination agreements by any landlords and mortgagees, and filed all financing statements necessary or reasonably requested by the Bank, to preserve and protect the security interest granted herein and to effectuate or maintain the priority thereof against all Persons.

Section 4.6. **Maintenance of Records.** The Borrower will keep and maintain at its own cost and expense complete books and records relating to the Collateral which are satisfactory to the Bank including, without limitation, a record of all payments received and all credits granted with respect to the Collateral and all of its other dealings with the Collateral. The Borrower will mark its books and records pertaining to the Collateral to evidence this Security Agreement and the security interests granted hereby. For the Bank's further security, the Borrower agrees that the Bank shall have a special property interest in all of the Borrower's books and records pertaining to the Collateral and the Borrower shall deliver and turn over any such books and records to the Bank or to its representatives at any time on demand of the Bank.

Section 4.7. **Compliance with Laws, etc.** The Borrower will comply, in all material respects, with all acts, rules, regulations, orders, decrees and directions of any governmental body, agency or official applicable to the Collateral or any part thereof or to the operation of the Borrower's business except to the extent that the failure to comply would not have a material adverse effect on the financial or other condition of the Borrower; provided, however, that the Borrower may contest any act, regulation, order, decree or direction in any reasonable manner which shall not in the sole opinion of the Bank adversely affect the Bank's rights or the first priority of its security interest in the Collateral.

Section 4.8. **Payment of Taxes, etc.** The Borrower will pay promptly when due, all taxes, assessments and governmental charges or levies imposed upon the Collateral or in respect of its income or profits therefrom, as well as all claims of any kind (including claims for labor, materials and supplies), except that no such charge need be paid if (i) the validity thereof is being contested in good faith by appropriate proceedings and (ii) such charge is adequately reserved against in accordance with GAAP.

Section 4.9. **Compliance with Terms of Accounts, Contracts and Licenses.** The Borrower will perform and comply in all material respects with all of its obligations under and, all agreements relating to the Collateral to which it is a party or by which it is bound.

Section 4.10. **Limitation on Liens on Collateral.** The Borrower will not create, permit or suffer to exist, and will defend the Collateral and the Borrower's rights with respect thereto against and take such other action as is necessary to remove, any Lien, security interest, encumbrance, or claim in or to the Collateral other than the security interests created hereunder, and except for Permitted Liens.

Section 4.11. **Limitations on Modifications of Receivables and Other Intangibles; No Waivers or Extensions.** The Borrower will not (i) amend, modify, terminate or waive any provision of any material Receivable or Other Intangible in any manner which might have a materially adverse effect on the value of such Receivable or Other Intangible as Collateral, (ii) fail to exercise promptly and diligently each and every material right which it may have under each Receivable and Other Intangible or (iii) fail to deliver to the Bank a copy of each material demand, notice or document received by it relating in any way to any Receivable or Other Intangible. The Borrower will not, without the Bank's prior written consent, grant any extension of the time of payment of any Receivable

- 8 -

TRADEMARK
REEL: 1773 FRAME: 0958

or amounts due under any material Other Intangible, compromise, compound or settle the same for less
than the full amount thereof, release, wholly or partly, any person liable for the payment thereof or
allow any credit or discount whatsoever thereon other than trade discounts granted in the normal
course of business, except such as in the reasonable judgment of the Borrower are advisable to enhance
the collectibility thereof.

Section 4.12.  **Maintenance of Insurance.**  The Borrower will maintain with
financially sound insurance companies licensed to do business in Virginia insurance policies (i)
insuring the Inventory and Equipment against loss by fire, explosion, theft and such other casualties as
are usually insured against by companies engaged in the same or similar business for an amount
satisfactory to the Bank and (ii) insuring the Borrower and the Bank against liability for personal injury
arising from, and property damage relating to, such Inventory and Equipment, such policies to be in
such form and to cover such amounts as may be satisfactory to the Bank, with losses payable to the
Borrower and the Bank as their respective interests may appear.  The Borrower shall, if so requested
by the Bank, deliver to the Bank as often as the Bank may reasonably request a report of the Borrower
or, if requested by the Bank, of an insurance broker satisfactory to the Bank of the insurance on the
Inventory and Equipment.  All insurance with respect to the Inventory and the Equipment shall (i)
contain a standard mortgagee clause in favor of the Bank, (ii) provide that any loss shall be payable in
accordance with the terms thereof notwithstanding any act of the Borrower which might otherwise
result in forfeiture of such insurance and that the insurer waives all rights of set-off, counterclaim,
deduction or subrogation against the Borrower, (iii) provide that no cancellation, reduction in amount
or change in coverage therefor shall be effective until at least 30 days after receipt by the Bank of
written notice thereof and (iii) provide that the Bank may, but shall not be obligated to, pay premiums
in respect thereof.

Section 4.13.  **Limitations on Dispositions of Collateral.**  The Borrower will not
directly or indirectly (through the sale of stock, merger or otherwise) without the prior written consent
of the Bank sell, transfer, lease or otherwise dispose of any of the Collateral, or attempt, offer or
contract to do so except for (i) sales of Inventory in the ordinary course of its business for fair value in
arm's-length transactions and (ii) so long as no Default has occurred and is continuing, dispositions in
a commercially reasonable manner of Equipment which has become redundant, worn out or obsolete or
which should be replaced so as to improve productivity, so long as the proceeds of any such
disposition are (i) used to acquire replacement equipment which has comparable or better utility and
equivalent or better value and which is subject to a first priority security interest in favor of the Bank
therein, except as permitted by Section 4.9 and except for Permitted Liens or (ii) applied to repay the
Obligations.  The inclusion of Proceeds of the Collateral under the security interests granted hereby
shall not be deemed a consent by the Bank to any sale or disposition of any Collateral other than as
permitted by this Section 4.13.

Section 4.34.  **Further Identification of Collateral.**  The Borrower will furnish to the
Bank from time to time statements and schedules further identifying and describing the Collateral and
such other reports in connection with the Collateral as the Bank may reasonably request.

Section 4.15.  **Notices.**  The Borrower will advise the Bank promptly and in
reasonable detail, (i) of any Lien, security interest, encumbrance or claim made or asserted against any
of the Collateral, (ii) of any material change in the composition of the Collateral, and (iii) of the
occurrence of any other event which would have a material effect on the aggregate value of the
Collateral or on the security interests granted to the Bank in this Security Agreement.

Section 4.16.  **Change of Law.**  The Borrower shall promptly:

(i)        notify the Bank of any change in law known to it [(and
will use its best efforts to become aware of any such change in law)] which (A)
adversely affects or will adversely affect the validity, perfection or priority of the
security interests granted hereby, (B) requires or will require a change in the
procedures to be followed in order to maintain and protect such validity,
perfection and priority or (C) could result in the Bank not having a perfected
security interest in any of the Collateral;

(ii)       furnish the Bank with an opinion of outside legal counsel
satisfactory to the Bank setting forth the procedures to be followed in order (A) to

- 9 -

TRADEMARK
REEL: 1773 FRAME: 0959

avoid (or to minimize if avoidance is impossible) such adverse effect, (B) to maintain and protect such validity, perfection and priority or (C) to assure that the Bank has perfected security interests in all of the Collateral; and

        (iii)     follow the procedures set forth in such opinion of counsel.

     **Section 4.17.  Right of Inspection.**  The Bank shall at all times have full and free access during normal business hours to all the books, correspondence and records of the Borrower, and the Bank or its representatives may examine the same, take extracts therefrom, make photocopies thereof and have such discussions with officers, employees and public accountants of the Borrower as the Bank may deem necessary, and the Borrower agrees to render to the Bank, at the Borrower's cost and expense, such clerical and other assistance as may be reasonably requested with regard thereto. The Bank and its representatives shall at all times also have the right to enter into and upon any premises where any of the Inventory or Equipment is located for the purpose of inspecting the same, observing its use or protecting interests of the Bank therein.

     **Section 4.18.  Maintenance of Equipment.**  The Borrower will, at its expense, generally maintain the Equipment in good operating condition, ordinary wear and tear excepted.

     **Section 4.19.  Covenants Regarding Patent and Trademark Collateral.**

     (a)     With respect to its existing Patents and Trademarks, and at such time as the Borrower shall acquire any Patents or Trademarks, it will comply with the terms, covenants and warranties of this Section 4.19.

     (b)     The Borrower (either itself or through licensees) will, unless the Borrower shall reasonably determine that a Trademark is of negligible economic value to the Borrower, (A) continue to use each Trademark on each and every Trademark class of goods applicable to its current products and services as reflected in its current catalogs, brochures and price lists in order to maintain each Trademark in full force and free from any claim of abandonment for non-use, (B) maintain as in the past the quality of products and services offered under each Trademark, (C) employ each Trademark with the appropriate notice of registration, (D) not adopt or use any mark which is confusingly similar or a colorable imitation of any Trademark and (E) not (and not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby any Trademark may become invalidated.

     (c)     The Borrower will not, unless the Borrower shall reasonably determine that a Patent is of negligible economic value to the Borrower, do any act, or omit to do any act, whereby any Patent may be abandoned or dedicated.

     (d)     The Borrower shall notify the Bank immediately if its knows, or has reason to know, that any application or registration relating to any Patent or Trademark may become abandoned or dedicated, or of any adverse determination or development (including, without limitation, the institution of, or any such determination or development in any proceeding in the United States Patent and Trademark Office or any court or tribunal in any country) regarding the Borrower's ownership of any Patent or Trademark, its right to register the same or keep and maintain the same.

     (e)     In no event shall the Borrower, either itself or through any agent, employee, licensee or designee, file an application for registration of any Patent or Trademark with the United States Patent and Trademark Office or any similar office or agency in any other country or any political subdivision thereof, unless it promptly informs the Bank and, upon request of the Bank, executes and delivers any and all agreements, instruments, documents and papers as the Bank may request to evidence the Bank's security interest in such Patent or Trademark and the goodwill and general intangibles of the Borrower relating thereto or represented thereby, and the Borrower hereby constitutes the Bank its attorney-in-fact to execute and file all such writings for the foregoing purposes, all such acts of such attorney being hereby ratified and confirmed.  Such power being coupled with an interest is irrevocable until the Obligations are paid and satisfied in full.

     (f)     The Borrower will take all necessary steps, including, without limitation, in any proceeding before the United States Patent and Trademark Office or any similar office or agency in any other country or any political subdivision thereof, to maintain and pursue each application (and

- 10 -

to obtain the relevant registration) and to maintain each registration of the Patents and Trademarks, including without limitation, filing of applications for renewal, affidavits of use and affidavits of incontestability.

(g)    If any of the Patent and Trademark Collateral is infringed, misappropriated or diluted by a third party, the Borrower shall promptly notify the Bank after it learns thereof and shall, unless the Borrower shall reasonably determine that such Patent and Trademark Collateral is of negligible economic value to the Borrower, promptly sue for infringement, misappropriation or dilution, seek injunctive relief where appropriate and to recover any and all damages for such infringement, misappropriation or dilution, or to take such other action as the Borrower shall reasonably deem appropriate under the circumstances to protect such Patent and Trademark Collateral.

Section 4.28.  Reimbursement Obligation.  Should the Borrower fail to comply with the provisions of the Credit Agreement, this Security Agreement, any other Loan Document to which it is a party or any other agreement relating to the Collateral such that the value of any Collateral or the validity, perfection, rank or value of any security interest granted to the Bank hereunder or thereunder is thereby diminished or potentially diminished or put at risk (as reasonably determined by the Bank), the Bank on behalf of the Borrower may, but shall not be required to, effect such compliance on behalf of the Borrower, and the Borrower shall reimburse the Bank for the cost thereof on demand, and interest shall accrue on such reimbursement obligation from the date the relevant costs are incurred until reimbursement thereof in full at the interest rate in effect under the Note.

## ARTICLE V
## REMEDIES; RIGHTS UPON DEFAULT

Section 5.1.  UCC Rights.  If any Event of Default shall have occurred, the Bank may in addition to all other rights and remedies granted to it in this Security Agreement and in any other instrument or agreement securing, evidencing or relating to the Obligations, exercise all rights and remedies of a secured party under the UCC and all other rights available to the Bank at law or in equity.

Section 5.2.  Payments on Collateral.  Without limiting the rights of the Bank under any other provision of the Security Agreement, if an Event of Default shall occur and be continuing:

(i)    all payments received by the Borrower under or in connection with any of the Collateral shall be held by the Borrower in trust for the Bank, shall be segregated from other funds of the Borrower and shall forthwith upon receipt by the Borrower be turned over to the Bank, in the same form as received by the Borrower (duly indorsed by the Borrower to the Bank, if required to permit collection thereof by the Bank); and

(ii)    all such payments received by the Bank (whether from the Borrower or otherwise) may, in the sole discretion of the Bank, be held by the Bank as collateral security for, and/or then or at any time thereafter applied in whole or in part by the Bank to the payment of the expenses and Obligations as set forth in Section 5.10.

Section 5.3.  Possession of Collateral.  In furtherance of the foregoing, the Borrower expressly agrees that, if an Event of Default shall occur and be continuing, the Bank may (i) by judicial powers, or without judicial process if it can be done without breach of the peace, enter any premises where any of such Collateral is or may be located, and without charge or liability to the Bank seize and remove such Collateral from such premises and (ii) have access to and use of the Borrower's books and records relating to such Collateral.

-11-

TRADEMARK
REEL: 1773 FRAME: 0961

### Section 5.4.  Sale of Collateral.

(a)     The Borrower expressly agrees that if an Event of Default shall occur and be continuing, the Bank, without demand of performance or other demand or notice of any kind (except the notice specified below of the time and place of any public or private sale) to the Borrower or any other Person (all of which demands and/or notices are hereby waived by the Borrower), may forthwith collect, receive, appropriate and realize upon the Collateral and/or forthwith sell, lease, assign, give an option or options to purchase or otherwise dispose of and deliver the Collateral (or contract to do so) or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or at any office of the Bank or elsewhere in such manner as is commercially reasonable and as the Bank may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  The Bank shall have the right upon any such public sale, and, to the extent permitted by law, upon any such private sale, to purchase the whole or any part of the Collateral so sold.  The Borrower further agrees, at the Bank's request, to assemble the Collateral, and to make it available to the Bank at places which the Bank may reasonably select.  To the extent permitted by applicable law, the Borrower waives all claims, damages and demands against the Bank arising out of the foreclosure, repossession, retention or sale of the Collateral.

(b)     Unless the Collateral threatens to decline speedily in value or is of a type customarily sold in a recognized market, the Bank shall give the Borrower ten days written notice of its intention to make any such public or private sale or sale as a broker's board or on a securities exchange.  Such notice shall (i) in the case of a public sale, state the time and place fixed for such sale, (ii) in the case of a sale at a broker's board or on a securities exchange, state the board or exchange at which such sale is to be made and the day on which the Collateral, or any portion thereof being sold, will first be offered for sale and (iii) in the case of a private sale, state the day after which such sale may be consummated.  The Bank shall not be required or obligated to make any such sale pursuant to any such notice.  The Bank may adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the same may be so adjourned.  In the case of any sale of all or any part of the Collateral for credit or for future delivery, the Collateral so sold may be retained by the Bank until the selling price is paid by the purchaser thereof, but the Bank shall not incur any liability in case of failure of such purchaser to pay for the Collateral so sold and, in the case of such failure, such Collateral may again be sold upon like notice.

### Section 5.5.  Rights of Purchasers.

Upon any sale of the Collateral (whether public or private), the Bank shall have the right to deliver, assign and transfer to the purchaser thereof the Collateral so sold.  Each purchaser (including the Bank) at any such sale shall hold the Collateral so sold free from any claim or right of whatever kind, including any equity or right of redemption of the Borrower, and the Borrower, to the extent permitted by law, hereby specifically waives all rights of redemption, including, without limitation, the right to redeem the Collateral under Section 9-506 of the UCC, and any right to a judicial or other stay or approval which it has or may have under any law now existing or hereafter adopted.

### Section 5.6.  Additional Rights of the Bank.

(a)     The Bank shall have the right and power to institute and maintain such suits and proceedings as it may deem appropriate to protect and enforce the rights vested in it by this Security Agreement and may proceed by suit or suits at law or in equity to enforce such rights and to foreclose upon and sell the Collateral or any part thereof pursuant to the judgment or decree of a court of competent jurisdiction.

(b)     The Bank shall, to the extent permitted by law and without regard to the solvency or insolvency at the time of any Person then liable for the payment of any of the Obligations or the then value of the Collateral, and without requiring any bond from any party to such proceedings, be entitled to the appointment of a special receiver or receivers (who may be the Bank) for the Collateral or any part thereof and for the rents, issues, tolls, profits, royalties, revenues and other income therefrom, which receiver shall have such powers as the court making such appointment shall confer, and to the entry of an order directing that the rents, issues, tolls, profits, royalties, revenues and other income of the property constituting the whole or any part of the Collateral be segregated, sequestered and impounded for the benefit of the Bank, and the Borrower irrevocably consents to the appointment of such receiver or receivers and to the entry of such order.

-12-

TRADEMARK
REEL: 1773 FRAME: 0962

### Section 5.7. Remedies Not Exclusive.

(a)     No remedy conferred upon or reserved to the Bank in this Security Agreement
is intended to be exclusive of any other remedy or remedies, but every such remedy shall be
cumulative and shall be in addition to every other remedy conferred herein or now or hereafter existing
at law, in equity or by statute.

(b)     If the Bank shall have proceeded to enforce any right, remedy or power under
this Security Agreement and the proceeding for the enforcement thereof shall have been discontinued
or abandoned for any reason or shall have been determined adversely to the Bank, the Borrower and
the Bank shall, subject to any determination in such proceeding, severally and respectively be restored
to their former positions and rights under this Security Agreement, and thereafter all rights, remedies
and powers of the Bank shall continue as though no such proceedings had been taken.

(c)     All rights of action under this Security Agreement may be enforced by the
Bank without the possession of any instrument evidencing any Obligation or the production thereof at
any trial or other proceeding relative thereto, and any suit or proceeding instituted by the Bank shall be
brought in its name and any judgment shall be held as part of the Collateral.

### Section 5.8. Waiver and Estoppel.

(a)     The Borrower, to the extent it may lawfully do so, agrees that it will not at any
time in any manner whatsoever claim or take the benefit or advantage of any appraisement, valuation,
stay, extension, moratorium, turnover or redemption law, or any law now or hereafter in force
permitting it to direct the order in which the Collateral shall be sold which may delay, prevent or
otherwise affect the performance or enforcement of this Security Agreement and the Borrower hereby
waives the benefits or advantage of all such laws, and covenants that it will not hinder, delay or
impede the execution of any power granted to the Bank in this Security Agreement but will permit the
execution of every such power as though no such law were in force; provided that nothing contained in
this Section 5.8 shall be construed as a waiver of any rights of the Borrower under any applicable
federal bankruptcy law.

(b)     The Borrower, to the extent it may lawfully do so, on behalf of itself and all
who may claim through or under it, including without limitation any and all subsequent creditors,
vendees, assignees and lienors, waives and releases all rights to demand or to have any marshalling of
the Collateral upon any sale, whether made under any power of sale granted herein or pursuant to
judicial proceedings or upon any foreclosure or any enforcement of this Security Agreement and
consents and agrees that all the Collateral may at any such sale be offered and sold as an entirety.

(c)     The Borrower, to the extent it may lawfully do so, waives presentment,
demand, protest and any notice of any kind (except notices explicitly required hereunder) in connection
with this Security Agreement and any action taken by the Bank with respect to the Collateral.

Section 5.9. **Power of Attorney.** The Borrower hereby irrevocably constitutes and
appoints the Bank, with full power of substitution, as its true and lawful attorney-in-fact with full
irrevocable power and authority in the place and stead of the Borrower and in the name of the
Borrower or in its own name, from time to time in the Bank's reasonable discretion for the purpose of
carrying out the terms of this Security Agreement, to take any and all appropriate action and to execute
any and all documents and instruments which may be necessary or desirable to accomplish the
purposes of this Security Agreement and, without limiting the generality of the foregoing, hereby gives
the Bank the power and right, on behalf of the Borrower, without notice to or assent by the Borrower
to do the following:

(i)     to pay or discharge taxes, liens, security interests or other
encumbrances levied or placed on or threatened against the Collateral;

(ii)    to effect any repairs or any insurance called for by the
terms of this Security Agreement and to pay all or any part of the premiums
therefor and the costs thereof; and

-13-

TRADEMARK
REEL: 1773 FRAME: 0963

(iii)    upon the occurrence and continuance of any Event of Default and otherwise to the extent provided in this Security Agreement, (A) to direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due and to come due thereunder directly to the Bank or as the Bank shall direct; (B) to receive payment of and receipt for any and all moneys, claims and other amounts due and to become due at any time in respect of or arising out of any Collateral; (C) to sign and indorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with accounts and other documents relating to the Collateral; (D) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any thereof and to enforce any other right in respect of any Collateral; (E) to defend any suit, action or proceeding brought against the Borrower with respect to any Collateral; (F) to settle, compromise and adjust any suit, action or proceeding described above and, in connection therewith, to give such discharges or releases as the Bank may deem appropriate; (G) to assign any Patent or Trademark (along with the goodwill of the business to which such Trademark pertains), for such term or terms, on such conditions, and in such manner, as the Bank shall in its sole discretion determine; and (H) generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Bank were the absolute owner thereof for all purposes, and to do, at the Bank's option and the Borrower's expense, at any time, or from time to time, all acts and things which the Bank deems necessary to protect, preserve or realize upon the Collateral and the Bank's security interest therein, in order to effect the intent of this Security Agreement, all as fully and effectively as the Borrower might do.

The Borrower hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.  This power of attorney is a power coupled with an interest and shall be irrevocable.

Section 5.10.  **Application of Proceeds.**  The Bank shall retain the net proceeds of any collection, recovery, receipt, appropriation, realization or sale of the Collateral and, after deducting all reasonable costs and expenses of every kind incurred therein or incidental to the care and safekeeping of any or all of the Collateral or in any way relating to the rights of the Bank hereunder, including reasonable attorneys' fees and legal expenses, apply such net proceeds to the payment in whole or in part of the Obligations in such order as the Bank may elect, the Borrower remaining liable for any amount remaining unpaid (and any attorneys fees paid by the Bank in collecting such deficiency) after such application.  Only after applying such net proceeds and after the payment by the Bank of any other amount required by any provision of law, including Section 9-504(1)(c) of the UCC, need the Bank account for the surplus, if any, to the Borrower or to whomsoever may be lawfully entitled to the same.

## ARTICLE VI
## MISCELLANEOUS

Section 6.1.  **Notices.**  Unless otherwise specified herein, all notices, requests or other communications to any party hereunder shall be in writing and shall be given to such party at its address set forth on the signature pages hereof or any other address or which such party shall have specified for the purpose of communications hereunder by notice to the other parties hereunder.  Each such notice, request or other communication shall be effective (i) if given by mail, three days after such communication is deposited, certified or registered, in the mails with first class postage prepaid, addressed as aforesaid or (ii) if given by other means, when delivered at the address specified in this Section 6.1.

Section 6.2.  **No Waivers.**  No failure on the part of the Bank to exercise, no course of dealing with respect to, and no delay in exercising any right, power or privilege under this Security Agreement or any document or agreement contemplated hereby shall operate as a waiver thereof or

-14-

TRADEMARK
REEL: 1773 FRAME: 0964

shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

Section 6.3.  Compensation and Expenses of the Bank.  The Borrower shall pay to the Bank from time to time upon demand, all of the fees, costs and expenses incurred by the Bank (including, without limitation, the reasonable fees and disbursements of counsel and any amounts payable by the Bank to any of its agents, whether on account of fees, indemnities or otherwise) (i) arising in connection with the preparation, administration, modification, amendment, waiver or termination of this Security Agreement or any document or agreement contemplated hereby or any consent or waiver hereunder or thereunder or (ii) incurred in connection with the administration of this Security Agreement, or any document or agreement contemplated hereby, or in connection with the administration, sale or other disposition of Collateral hereunder or under any document or agreement contemplated hereby or the preservation, protection or defense of the rights of the Bank in and to the Collateral.

Section 6.4.  Indemnification.  The Borrower shall at all times hereafter indemnify, hold harmless and, on demand, reimburse the Bank, its subsidiaries, affiliates, successors, assigns, officers, directors, employees and agents, and their respective heirs, executors, administrators, successors and assigns (all of the foregoing parties, including, but not limited to, the Bank, being hereinafter collectively referred to as the "Indemnities" and individually as an "Indemnitee") from, against and for any and all liabilities, obligations, claims, damages, actions, penalties, causes of action, losses, judgments, suits, costs, expenses and disbursements, including, without limitation, attorney's fees (any and all of the foregoing being hereinafter collectively referred to as the "Liabilities" and individually as a "Liability") which the Indemnitees, or any of them, might be or become subjected, by reason of, or arising out of the preparation, execution, delivery, modification, administration or enforcement of, or performance of the Bank's rights under, this Security Agreement or any other document, instrument or agreement contemplated hereby or executed in connection herewith; provided that the Borrower shall not be liable to any Indemnitee for any Liability caused solely by the gross negligence or willful misconduct of such Indemnitee.  In no event shall any Indemnitee, as a condition to enforcing its rights under this Section 6.4 or otherwise, be obligated to make a claim against any other Person (including, without limitation, the Bank) to enforce its rights under this Section 6.4.

Section 6.5.  Amendments, Supplements and Waivers.  The parties hereto may, from time to time, enter into written agreements supplemental hereto for the purpose of adding any provisions to this Security Agreement, waiving any provisions hereof or changing in any manner the rights of the parties.

Section 6.6.  Successors and Assigns.  This Security Agreement shall be binding upon and inure to the benefit of each of the parties hereto and shall inure to the benefit of the Bank's successors and assigns, including, without limitation, any or all of the Guarantors through subrogation. Nothing herein is intended or shall be construed to give any other Person any right, remedy or claim under, to or in respect of this Security Agreement or any Collateral.

Section 6.7.  Limitation of Law; Severability.  (a) All rights, remedies and powers provided in this Security Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law, and all the provisions of this Security Agreement are intended to be subject to all applicable mandatory provisions of law which may be controlling and to be limited to the extent necessary so that they will not render this Security Agreement invalid, unenforceable in whole or in part, or not entitled to be recorded, registered or filed under the provisions of any applicable law.

(b)    If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (i) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in order to carry out the intentions of the parties hereto as nearly as may be possible; and (ii) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provisions in any other jurisdiction.

Section 6.8.  Governing Law.  This Security Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia.

-25-

TRADEMARK
REEL: 1773 FRAME: 0965

Section 6.9.  **Counterparts; Effectiveness.**  This Security Agreement may be signed in any number of counterparts with the same effect as if the signatures thereto and hereto were upon the same instrument.  This Security Agreement shall become effective when the Bank shall receive counterparts executed by itself and the Borrower.

Section 6.10.  **Termination; Survival.**  This Security Agreement shall terminate when the security interests granted hereunder have terminated and the Collateral has been released as provided in Section 2.6, **provided** that the obligations of the Borrower under any of Section 4.20, 6.3, and 6.4 shall survive any such termination.

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be duly executed by their respective authorized officers as of the day and year first written above.

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.                                      [SEAL]

8201 Greensboro Drive, Suite 350
McLean, Virginia  22102

By _R.K. Arnold_____
Name: R.K. ARNOLD
Title: President

- 16 -

TRADEMARK
REEL: 1773 FRAME: 0966

Schedule 1

Borrower's Chief Executive Office
 and Principal Place of Business

Locations of Records of Receivables
 and Other Intangibles

Schedule 2
Locations of Equipment and Inventory

Schedule 3
Real Estate

Schedule 4
Trade Names, Division Names, etc.

TRADEMARK
REEL: 1773 FRAME: 0967

Schedule 5

Required Filings and Recordings

RECORDED: 08/10/1998

TRADEMARK
REEL: 1773 FRAME: 0968

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 3

D1566545



**Secretary of State**
**Certificate of Surrender**
(Foreign Qualified Corporation ONLY)

| SURC |

FILED
SECRETARY OF STATE
STATE OF CALIFORNIA

APR 15 2020

**IMPORTANT — Read Instructions before completing this form.**

There is No Fee for filing a Certificate of Surrender

Copy Fees — First page $1.00; each attachment page $0.50;
Certification Fee - $5.00

*Note:* For information about Franchise Tax Board final tax return requirements, go to https://www.ftb.ca.gov.

This Space For Office Use Only

1. **Corporate Name** (Enter the exact name of the corporation as it is recorded with the California Secretary of State. Note: If you registered in California using an assumed name, see instructions.)

Quicken Loans Inc.

2. **7-Digit Secretary of State File Number**      3. **Jurisdiction** (State, foreign country or place where this corporation is formed.)

| C2111289 | Michigan |

4. **Mailing Address to mail copies of Legal Service** (Enter the complete mailing address where the California Secretary of State may forward copies of any legal documents against the corporation that are served on the Secretary of State intended for the corporation.)

| Mailing Address of Corporation | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 1050 Woodward Avenue | Detroit | MI | 48226 |

5. **Required Statements** (Do not alter the Required Statements – ALL must be true to file this Certificate of Surrender.)

Statements 5(a) – 5(d) are true:

a) The corporation hereby surrenders its rights and authority to transact intrastate business in the State of California.

b) The corporation hereby revokes its designation of agent for service of process in California.

c) The corporation consents to process against it in any action upon any liability or obligation incurred within the State of California prior to the filing of this Certificate of Surrender may be served upon the California Secretary of State.

d) All final returns required under the California Revenue and Taxation Code have been or will be filed with the California Franchise Tax Board.

6. **Read and Sign Below** (See Instructions. Office or title not required.)

I am a corporate officer and am authorized to sign on behalf of the foreign corporation.

Signature

Jay Farner
Type or Print Name

SURC (REV 01/2017)

2017 California Secretary of State
bizfile.sos.ca.gov

# License Details

| | |
|---|---|
| **License Number:** | 8138612 |
| **License Status:** | Inactive |
| **Status Effective Date:** | |
| **Licensee Name:** | QUICKEN LOANS INC. |
| **Organization DBA:** | |
| **Originally Licensed Date:** | 8/5/2004 |
| **License Type:** | California Residential Mortgage Lender |
| **Address:** | 800 TOWER DRIVE, SUITE 200 |
| | TROY, MI 48098 |
| **Public Actions:** | No |

*ACCEPTED*

## UNITED STATES OF AMERICA
## CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING

File No. 2017-CFPB-0014

In the Matter of:

FAY SERVICING, LLC

**CONSENT ORDER**

    The Consumer Financial Protection Bureau (Bureau) has reviewed the mortgage servicing practices of Fay Servicing, LLC (Respondent, as defined below), specifically related to its handling of loss-mitigation applications and its implementation of foreclosure protections required to be afforded to borrowers engaged in the loss-mitigation process, and has identified the following law violations. Respondent violated the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. 2601, *et seq.*, its implementing regulation, Regulation X, 12 C.F.R. part 1024, and the Consumer Financial Protection Act of 2010 (CFPA) as follows: Respondent took prohibited foreclosure actions against certain borrowers, in violation of 12 C.F.R. § 1024.41(f)(2) and (g); Respondent failed to have policies and procedures reasonably designed to provide required foreclosure protections in compliance with applicable law, in violation of 12 C.F.R. § 1024.38(a) and (b)(1)(v); Respondent failed to send or timely send acknowledgment notices to numerous borrowers, in violation of 12 C.F.R. § 1024.41(b)(2)(i)(B); Respondent failed to state in the acknowledgment notices the additional documents and information needed from borrowers to make their loss-

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 4

Electronically
Recorded in Official Records
San Bernardino County
Bob Dutton
Assessor-Recorder-County Clerk

**WFG National Default Services**
RECORDING REQUESTED BY:
ZBS Law, LLP

DOC# 2022-0222742

| 06/23/2022 08:39 AM | Titles: 1 | Pages: 5 | |
|---|---|---|---|
| SAN | | Fees | $36.00 |
| | | Taxes | $0.00 |
| C5032 | | CA SB2 Fee | $75.00 |
| | | Total | $111.00 |

WHEN RECORDED MAIL TO:

ZBS Law, LLP
30 Corporate Park, Suite 450
Irvine, CA 92606

2140150CA

TS No.: 22001445-1 CA
APN: 1043-131-08-0-000

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

### PURSUANT TO CIVIL CODE § 2923.3(a), THE SUMMARY OF INFORMATION REFERRED TO BELOW IS NOT ATTACHED TO THE RECORDED COPY OF THIS DOCUMENT BUT ONLY TO THE COPIES PROVIDED TO THE TRUSTOR.
NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED

注：本文件包含一个信息摘要

참고사항: 본 첨부 문서에 정보 요약서가 있습니다

NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

### IMPORTANT NOTICE
## IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION, and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until approximately 90 days from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is **$16,014.38** as of **06/21/2022** and will increase until your account becomes current. While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your Note and Deed of Trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the Note and Deed of Trust or mortgage, the Beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the Beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the Beneficiary or mortgagee will give you a written itemization of the entire amount you must pay.  You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made.  However, you and your Beneficiary or mortgagee may mutually agree in writing prior to the time the Notice of Sale is posted (which may not be earlier than three months after this notice of default is recorded) to, among other things. (1) Provide additional time in which to cure the default by transfer of the property or otherwise; or (2) Establish a schedule of payments in order to cure your default; or, both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.  To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact

**US Bank Trust National Association, Not in its Individual Capacity But Solely As Owner Trustee For VRMTG Asset Trust**

C/O Fay Servicing, LLC

800-495-7166

C/O ZBS Law, LLP

30 Corporate Park, Suite 450

Irvine, CA 92606

PHONE: 714-848-7920

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.  Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.  **Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.**

**NOTICE IS HEREBY GIVEN:**  That ZBS Law, LLP is either the original Trustee, the duly appointed substituted Trustee, or acting as agent for the Trustee or Beneficiary under a Deed of Trust dated 06/06/2003, executed by **JEFFREY J. GWAY AND LILLIAN Q. GWAY, HUSBAND AND WIFE, AS JOINT TENANTS**, as Trustor, to secure certain obligations in favor of **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS BENEFICIARY, AS NOMINEE FOR QUICKEN LOANS INC. ITS SUCCESSORS AND ASSIGNS** as Beneficiary, recorded 06/18/2003, as Instrument No. 2003-0408381. of Official Records of San Bernardino County, California; describing land therein as: As more particularly described on said Deed of Trust.

The subject obligation includes NOTE(S) FOR THE ORIGINAL sum of **$269,000.00**.  A breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of the following:

**The monthly installment of principal and interest which became due on January 01, 2022, late charges, and all subsequent monthly installments of principal and interest.**

**You are responsible to pay all payments and charges due under the terms and conditions of the loan documents which come due subsequent to the date of this notice, including, but not limited to, foreclosure trustee fees and costs, advances and late charges.**

**Furthermore, as a condition to bring your account in good standing, you must provide the undersigned with written proof that you are not in default on any senior encumbrance and provide proof of insurance. Nothing in this notice of default should be construed as a waiver of any fees owing to the beneficiary under the deed of trust, pursuant to the terms and provisions of the loan documents.**

That by reason thereof, the present Beneficiary under such Deed of Trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such Deed of Trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

This office is enforcing a security interest of your creditor. To the extent that your obligation has been discharged by a bankruptcy court or is subject to an automatic stay of bankruptcy, this notice is for informational purposes only and does not constitute a demand for payment or any attempt to collect such obligation.

**The loan servicer has fulfilled its obligation under either California Civil Code section 2923.5 or 2923.55 (as applicable). Please see Declaration of Compliance attached hereto.**

Dated: 06/21/2022                          ZBS LAW, LLP, as Trustee

Rick Mroczek, Trustee Sale Officer

DOC #2022-0222742 Page 4 of 5

# California Declaration of Compliance
## (Cal.Civ. Code § 2923.55)

| | |
|---|---|
| Borrower(s) | JEFFREY J. GWAY AND LILLIAN Q. GWAY, HUSBAND AND WIFE, AS JOINT TENANTS |
| Mortgage Servicer: | Fay Servicing, LLC |
| Property Address: | 5804 TURQUOISE AVE<br>RANCHO CUCAMONGA, CA 91701 |
| T.S. No.: | 22001445-1 CA |

The undersigned, as an authorized agent or employee of the below mortgage servicer, declares as follows:

1. ☐ The mortgage servicer has contacted the borrower to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure as required by California Civil Code § 2923.55(b(2). At least thirty (30) days have passed since the initial contact was made.

2. ☒ The mortgage servicer has tried with due diligence to contact the borrower as required by California Civil Code § 2923.55(f) but has not made contact despite such due diligence. At least thirty (30) days have passed since these due diligence efforts were satisfied.

3. ☐ No contact was required because the individual did not meet the definition of "borrower" under California Civil Code § 2920.5(c).

4. ☐ The requirements of California Civil Code § 2923.55 do not apply because the loan is not secured by a first lien mortgage or deed of trust on "owner-occupied" or qualifying tenant-occupied residential real property as defined by California Civil Code § 2924.15.

Furthermore, pursuant to California Civil Code § 3273.10:

1. ☒ During the effective time period of 8/31/2020 through 12/1/2021, the mortgage servicer did not deny a forbearance request that met the conditions of California Civil Code § 3273.10(a).

2. ☐ During the effective time period of 8/31/2020 through 12/1/2021, the mortgage servicer denied a forbearance request that met the conditions of California Civil Code § 3273.10(a). A copy of the written forbearance denial notice attached.
A Forbearance ☐ was ☐ was not subsequently provided.

3. ☐ The requirements of California Civil Code § 3273.10 do not apply because the borrower was not current on payments as of 2/1/2020 and/or did not experience a financial hardship due, directly or indirectly, to the COVID-19 emergency in connection with a mortgage or deed of trust secured by residential property containing four dwelling units or less.

4. ☐ The mortgage servicer is in compliance with California Civil Code § 3273.10 because the mortgage servicer has complied with the relevant provisions refarding forbearance in Section 4022 of the federal Coronavirus Aid, Relief, and Economic Security Act (the Cares Act) (Public Law 116-136), including any amendments or revisions to those provisions, pursuant to California Civil Code § 3273.10(d).

ATTACHMENT TO NOTICE OF DEFAULT

I certify and represent that this mortgage servicer's declaration is accurate, complete and based upon competent and reliable evidence, which the mortgage servicer has reviewed including my review of the mortgage servicer's business records, to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information.

Fay Servicing, LLC, Mortgage Servicer

Dated: 6/2/2022

By: 

Juliet Muller
Vice President

ATTACHMENT TO NOTICE OF DEFAULT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 5

WFG National-Default Services

[RECORDING REQUESTED BY]
ZBS Law, LLP

[WHEN RECORDED MAIL TO:]
ZBS Law, LLP
30 Corporate Park, Suite 450
Irvine, CA 92606



Electronically
Recorded in Official Records
San Bernardino County

Assessor-Recorder-County Clerk

## DOC# 2022-0326616

| | 09/28/2022 01:01 PM SAN I5190 | Titles: 1    Pages: 3 | |
|---|---|---|---|
| | | Fees | $32.00 |
| | | Taxes | $0.00 |
| | | CA SB2 Fee | $75.00 |
| | | Total | $107.00 |

T.S. No. 22001445-1 CA          APN: 1043-131-08-0-000

# NOTICE OF TRUSTEE'S SALE

PURSUANT TO CIVIL CODE § 2923.3(a), THE SUMMARY OF INFORMATION REFERRED TO BELOW IS NOT ATTACHED TO THE RECORDED COPY OF THIS DOCUMENT BUT ONLY TO THE COPIES PROVIDED TO THE TRUSTOR.

NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED

注：本文件包含一个信息摘要

참고사항: 본 첨부 문서에 정보 요약서가 있습니다

NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO

TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NANAKALAKIP

LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI   LIỆU NÀY

YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 06/06/2003. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.

A public auction sale to the highest bidder for cash, cashier's check drawn on a state or national bank, check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, or savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state will be held by the duly appointed trustee as shown below, of all right, title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant to a Deed of Trust described below. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, with interest and late charges thereon, as provided in the note(s), advances, under the terms of the Deed of Trust, interest thereon, fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on the day of sale.

Trustor: **JEFFREY J. GWAY AND LILLIAN Q. GWAY, HUSBAND AND WIFE, AS JOINT TENANTS**

Duly Appointed Trustee: ZBS Law, LLP

Deed of Trust Recorded on **06/18/2003**, as Instrument No. **2003-0408381** of Official Records of **San Bernardino** County, **California**;

DOC #2022-0326616  Page 3 of 3

Dated: 09/27/2022          ZBS Law, LLP, as Trustee
                           30 Corporate Park, Suite 450 ,
                           Irvine, CA 92606
                           For Non-Automated Sale Information, call: (714) 848-7920
                           For Sale Information: 866-266-7512 or www.elitepostandpub.com

                           Michael Busby, Trustee Sale Officer

This office is enforcing a security interest of your creditor. To the extent that your obligation has been
discharged by a bankruptcy court or is subject to an automatic stay of a bankruptcy, this notice is for
informational purposes only and does not constitute a demand for payment or any attempt to collect such
obligation.

DOC #2022-0326616  Page 2 of 3

Date of Sale: **10/31/2022 at 01:00 PM**

Place of Sale:    **Near the front steps leading up to the City of Chino Civic Center, 13220 Central Avenue Chino, CA 91710**

Estimated amount of unpaid balance and other charges:  **$169,164.24**

Note: Because the Beneficiary reserves the right to bid less than the total debt owed, it is possible that at the time of the sale the opening bid may be less than the total debt owed.

Street Address or other common designation of real property:

**5804 TURQUOISE AVE
RANCHO CUCAMONGA, CA 91701**

Described as follows:
As more fully described on said Deed of Trust.

A.P.N #.: **1043-131-08-0-000**

The undersigned Trustee disclaims any liability for any incorrectness of the street address or other common designation, if any, shown above.  If no street address or other common designation is shown, directions to the location of the property may be obtained by sending a written request to the beneficiary within 10 days of the date of first publication of this Notice of Sale.

NOTICE TO POTENTIAL BIDDERS: If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

NOTICE TO PROPERTY OWNER: The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale.  If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this property, you may call **866-266-7512** or visit this Internet Web site **www.elitepostandpub.com** using the file number assigned to this case **22001445-1 CA**. Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Web site.  The best way to verify postponement information is to attend the scheduled sale.

NOTICE TO TENANT: You may have a right to purchase this property after the trustee auction pursuant to Section 2924m of the California Civil Code. If you are an "eligible tenant buyer," you can purchase the property if you match the last and highest bid placed at the trustee auction. If you are an "eligible bidder," you may be able to purchase the property if you exceed the last and highest bid placed at the trustee auction. There are three steps to exercising this right of purchase. First, 48 hours after the date of the trustee sale, you can call **866-266-7512** or visit this Internet Web site **www.elitepostandpub.com** using the file number assigned to this case **22001445-1 CA** to find the date on which the trustee's sale was held, the amount of the last and highest bid, and the address of the trustee. Second, you must send a written notice of intent to place a bid so that the trustee receives it no more than 15 days after the trustee's sale. Third, you must submit a bid so that the trustee receives it no more than 45 days after the trustee's sale. If you think you may qualify as an "eligible tenant buyer" or "eligible bidder," you should consider contacting an attorney or appropriate real estate professional immediately for advice regarding this potential right to purchase.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 6



FEDERAL TRADE COMMISSION
# Identity Theft Report

FTC Report Number:
154339529

I am a victim of identity theft. This is my official statement about the crime.

## Contact Information

| First Name: | Middle Name: | Last Name: |
|---|---|---|
| Jeffrey | J | Gway |
| **Address:** | **Phone:** | **Email:** |
| 5804 Turquoise Ave Rancho Cucamonga , CA 91701 USA | 909-418-0102 | realestateoptions1@yahoo.com |

## Personal Statement

Jeffrey J. Gway Lillian Q. Gway victims of a financial identity theftprohibition scheme affecting my tax records. It is a clear violation of tax evasion pursuant to IRC 7201 7206. These false recorded documents was used to pledge our signatures electronically without our consent. This was a violation of Title 15 U.S.C Chapter 96 section 7003a. Dates of events: on 6242019 Corporate Assignment of Deed of Trust, On 11152021 Assignment of Deed of Trust, On 6232022 Notice of Default, On 9282022 Notice of Trustee Sale. On June 6, 2003 Gway Family only signed a contract with Quicken Loans Inc. Names ID Criminals: Ercilia Green VP, Mark T. Waterman VP, Rick Mroczek, TSO, Michael Busby,TSO.

## Tax Fraud

| Date that I discovered it |
|---|
| 12/2022 |

**Under penalty of perjury, I declare this information is true and correct to the best of my knowledge.**

I understand that knowingly making any false statements to the government may violate federal, state, or local criminal statutes, and may result in a fine, imprisonment, or both.

| *Jeffrey J Gway* | 12/12/2022 |
|---|---|
| Jeffrey J Gway | Date |

Use this form to prove to businesses and credit bureaus that you have submitted an FTC Identity Theft Report to law enforcement. Some businesses might request that you also file a report with your local police.

# Federal Trade Commission:

## Law, Practice and Procedure

*Antitrust*
*Trade Regulation*
*Series*

RECEIVED

OCT 31 2014

Orange County Public Law Library
Santa Ana, California

NOW AVAILABLE IN
DIGITAL FORMATS!

# FEDERAL TRADE COMMISSION

## Law, Practice and Procedure

Peter C. Ward

**2014**

(Date originally published: 1986)

Law Journal Press
120 Broadway
New York, New York 10271
www.lawcatalog.com

# 00601
(Rel. 54)



Upkeep Service Record for:

# FEDERAL TRADE COMMISSION
### Law, Practice and Procedure

Updated through Release 54

This page is a reminder that this copy of *Federal Trade Commission: Law, Practice and Procedure* is up-to-date through Release 54, issued by the publisher in 2014.

This page should be filed in front of your volume and retained there until the issuance of Release 55.

Questions with respect to filing instructions should be addressed to Matt Messmer: (212) 457 -7818.

Law Journal Press
120 Broadway
New York, New York 10271

#00601

**LJP** Law Journal Press™

NOW AVAILABLE IN DIGITAL FORMATS!

*From Law Journal Press here is your current update to:*

gen4
KF
1611
.W35
1986

# FEDERAL TRADE COMMISSION
## Law, Practice and Procedure

by
Peter C. Ward

RECEIVED

MAY 1 5 2014

Orange County Public Law Library
Santa Ana California

**Release 53**
**Highlights:**

6-19-14EH    601R53

Release 53 for *Federal Trade Commission: Law, Practice & Procedure* examines provisions added by the Federal Trade Commission to the Hart-Scott-Rodino premerger filing requirements. These provisions were added to provide a framework for determining the requirements for filing patent rights transfers in the pharmaceutical industry and to address withdrawal of filings, and penalties were imposed in two matters involving Hart-Scott-Rodino violations. In addition, the Commission updated its vocational school guides and enforced its guides for environmental marketing claims.

Among other topics addressed in Release 53 are:

- Consent orders addressing unfairness in breaches of confidentiality of consumer data and misrepresentation of security of data
- Consent decrees and penalties for violation of the Fair Debt Collection Practices Act
- FTC safe harbor reviews of parental consent procedures under the Children's Online Privacy Protection Act
- Withdrawal of a penalty suspension due to defendant's misrepresentation of financial condition
- Consent order involving misrepresentation of "Made in U.S.A" claim

41587151    [See next page for Filing Instructions]

## § 10.15  Gramm-Leach-Bliley (Financial Privacy) Act

In 1999, Congress enacted major banking reform legislation with the passage of the Gramm-Leach-Bliley Act.[1] Title V of the Act, entitled "Privacy,"[2] prohibits the disclosure by a financial institution of any nonpublic personal information of consumers to nonaffiliated third parties unless the person whose information is involved is provided advance notice of the institution's policies and practices regarding disclosure of such information and the person is given the opportunity to direct that such information regarding the person not be disclosed to nonaffiliated third parties.[3]

### [1]—Financial Institutions Defined and Enforcement Authority

The Gramm-Leach-Bliley privacy requirements apply to "financial institutions," defined as any institution the business of which is engaging in financial activities as defined by the Bank Holding Company Act of 1956.[4] While most financial institutions are regulated by agencies other than the Federal Trade Commission,[5] the definition includes numerous activities that might not be thought of immediate-

---

[1] Gramm-Leach-Bliley Act ("G-L-B Act"), Pub. L. No. 106-102, 113 Stat. 1338 (1999).

[2] G-L-B Act §§ 501 *et seq.* (codified at 15 U.S.C. §§ 6801 *et seq.*). See also: FTC implementing regulations at 16 C.F.R. Part 313 and FTC Supplementary Information at 65 Fed. Reg. 33646 (2000) and "Frequently Asked Questions for the Privacy Regulation," available at http://www.ftc.gov/privacy/glbact/glb-faq.htm (last visited Feb. 15, 2012). In 2011, the rule was transferred to the new Consumer Financial Protection Bureau and repromulgated, with technical changes, at 12 C.F.R. Part 1009 (Regulation I). 76 Fed. Reg. 78126 (2011). The Act and the FTC's implementing regulations withstood constitutional and other challenges in Trans Union LLC v. FTC, 295 F.3d 42 (D.C. Cir. 2002).

[3] G-L-B Act § 502(a), 15 U.S.C. § 6802(a). See also, 16 C.F.R. § 313.10 (FTC Regulations). Subtitle B of Title V, entitled "Fraudulent Access to Financial Information," prohibits anyone from obtaining or requesting another person to obtain customer information from a financial institution by making false statements or providing forged or ill-gotten documents. G-L-B Act § 521, 15 U.S.C. § 6821. With certain exceptions, enforcement of Subtitle B is by the Federal Trade Commission in the same manner as it enforces the Fair Debt Collection Practices Act. G-L-B Act § 522, 15 U.S.C. § 6822. See § 9.08[4] *supra*. See, e.g., Goal Financial, LLC, 5 CCH Trade Reg. Rep. ¶ 16,119 (FTC 2008) (consent order).

[4] G-L-B Act § 509(3), 15 U.S.C. § 6809(a). See also, 16 C.F.R. § 313.3(k) (FTC Regulations). Attorneys engaged in the practice of law are not covered by the act. American Bar Ass'n v. FTC, 2005-2 CCH Trade Cas. ¶ 75,050 (D.C. Cir. 2005).

[5] See G-L-B Act § 505(a), 15 U.S.C. § 6805(a). Implementing regulations have been promulgated by the following federal functional regulators for entities subject to their regulatory jurisdictions: Office of the Comptroller of the Currency, 12 C.F.R. Part 40; Board of Governors of the Federal Reserve System, 12 C.F.R. Part 216; Federal Deposit Insurance Corporation, 12 C.F.R. Part 332; Office of Thrift Supervision, 12 C.F.R. Part 573; National Credit Union Administration, 12 C.F.R. Parts 716 and 741; and Securities and Exchange Commission, 17 C.F.R. Part 248.

## § 10.14  Identity Theft and Assumption Deterrence Act of 1998

In 1998, the Identity Theft and Assumption Deterrence Act was enacted, expanding the persons to whom penalties for identification theft and use are applicable to include those who knowingly transfer or use "a means of identification of another person" with intent to violate the law.[1] That Act also imposed on the Federal Trade Commission the responsibility to formulate procedures to log and acknowledge receipt of complaints from persons believing that their means of identification have been unlawfully acquired. The Commission is then authorized to provide such persons with informational materials relating to such theft and to refer complaints to "appropriate entities," which may include a national consumer reporting agency and law enforcement agencies.[2] In 1999, the Federal Trade Commission established such a system of records[3] and established procedures to accord with the protections of the Privacy Act of 1974.[4]

The Commission has installed a toll-free number, 1-877-IDTHEFT, where those who have been the victim of identity theft can report the crime and receive advice.[5] From these reports, the FTC will establish a national clearinghouse for ID theft complaint data. ID theft complaints also can be registered with the Commission on a complaint form located at www.consumer.gov/idtheft. A booklet addressing identity theft can be accessed at that site.

---

[1] Pub. L. No. 105-318, 112 Stat. 3007, *amending* 18 U.S.C. § 1028. A "means of identification" is defined as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual." 18 U.S.C. § 1028(d)(3). See also, FTC v. Martinez, CCH Trade Reg. Rep. ¶ 15,133 (C.D. Cal. 2001) (consent decree; selling means of producing fake I.D.s violates FTC Act) and complaint, available at http://www.ftc.gov/os/2000/12/martinez.pdf (last visited July 30, 2008).

[2] Identity Theft and Assumption Deterrence Act § 5, 18 U.S.C. 1028 note. See § 9.06 *supra* (identity theft provisions of Fair Credit Reporting Act).

[3] 16 C.F.R. § 4.13(m)(2), *as amended by* 64 Fed. Reg. 69397 (1999).

[4] 64 Fed. Reg. 57887 (1999).

[5] See press release, available at http://www.ftc.gov/opa/2000/02/idtheft.htm (last visited July 30, 2008).



ly as qualifying an entity as a "financial institution."[6] Such entities, not otherwise regulated, fall under the privacy enforcement jurisdiction of the Federal Trade Commission.[7] State laws are not preempted except to the extent that they are inconsistent with the Act.[8] No private right of action is created.

### [2]—Circumstances That Trigger the Notice Requirement

The Act applies to a financial institution's disclosure of "nonpublic personal information" to nonaffiliated third parties.[9] "Nonpublic personal information" is personally identifiable financial information that is provided by the consumer to obtain a financial product or service to be used for personal, family or household purposes, or any such information that results from or is otherwise obtained from any transaction with a consumer involving a financial product or service.[10]

The FTC's regulations that require notice and the opportunity to opt out differ according to whether the person whose personal nonpublic

---

[6] The definition of "financial institution" includes not only the traditional financial activities specified in Section 4(b) of the Bank Holding Company Act of 1956, 12 U.S.C. § 1843(k), but also activities that the Federal Reserve Board has found in 12 C.F.R. § 211.5(d) and 12 C.F.R. § 225.28 to be either closely related to banking or usual in connection with the transaction of banking or other financial operations abroad. The FTC regulations include as examples of financial institutions: (1) a retailer that extends credit by issuing its own credit card; (2) a personal property or real estate appraiser; (3) an automobile dealership that, as a usual part of its business, leases automobiles on a nonoperating basis for longer than 90 days; (4) a career counselor that specializes in providing career counseling services involving employment in a financial institution; (5) a business that prints and sells checks; (6) a business that regularly wires money to and from consumers; (7) a check cashing business; (8) an accountant or other tax preparation service that is in the business of completing income tax returns; (9) a business that operates a travel agency in connection with financial services; (10) an entity that provides real estate settlement services; (11) a mortgage broker; and (12) an investment advisory company or a credit counseling service. See 16 C.F.R. § 313.3(k)(2). See FTC v. Amerdebt, Inc., 2004-2 CCH Trade Cas. ¶ 74,624 (D. Md. 2004) (debt counseling service subject to Act).

[7] G-L-B Act § 505(a)(7), 15 U.S.C. § 6805(a)(7). See Trans Union LLC v. FTC, 295 F.3d 42 (D.C. Cir. 2002) (credit reporting agency is "financial institution").

[8] G-L-B Act § 507, 15 U.S.C. § 6807; 16 C.F.R. § 313.17. See http://www.ftc.gov/os/2001/06/northdakotaletter.htm (last visited July 21, 2005) (Act does not preempt North Dakota law) and http://www.ftc.gov/opa/2005/05/fyi0537.htm (last visited Dec. 26, 2005) (Act not inconsistent with California law).

[9] G-L-B Act § 502(a), 15 U.S.C. § 6802(a). See also, 16 C.F.R. § 313.4(a). A "nonaffiliated third party" is any company that is not under common control with the disclosing company. See G-L-B Act § 509(5), 15 U.S.C. § 6809(5). See also, 16 C.F.R. § 313.3(a) (defining "affiliate") and 16 C.F.R. § 313.3(m) (defining "nonaffiliated third party").

[10] G-L-B Act § 509(4), 15 U.S.C. § 6809(4). See 16 C.F.R. § 313.3(n). See also, Trans Union LLC v. FTC, 295 F.3d 42 (D.C. Cir. 2002).

§ 10.15[2]        FEDERAL TRADE COMMISSION            10-66.2

information is involved is only a "consumer" or whether that person has
become a "customer." The line between a "consumer" and a "customer"
is somewhat elusive, the deciding factor being whether the institution

*(Text continued on page 10-67)*



**CODE OF FEDERAL REGULATIONS**

# Title 12
Banks and Banking

Parts 900 to 1025

Revised as of January 1, 2021

Containing a codification of documents
of general applicability and future effect

As of January 1, 2021

Published by the Office of the Federal Register
National Archives and Records Administration
as a Special Edition of the Federal Register



and the consumer have established some kind of a continuing relationship, regardless of its duration, that turns a "consumer" into a "customer."[11] For instance, a person who applies for credit by submitting personal information for the institution's evaluation is a "consumer" of financial services (the evaluation) but, if credit is denied, does not become a "customer."

As to "consumers," personal information may not be disclosed by the financial institution to any nonaffiliated third party unless the consumer first has been provided with a notice of the institution's policies and practices with regard to disclosure of the information and the consumer is given the opportunity to direct that the information pertaining to that consumer not be disclosed.[12] If an institution does not, as a matter of policy, disclose nonpublic personal information of a consumer to any nonaffiliated entity, it does not have a disclosure obligation under the Act, although it may choose to advise consumers that it has such a nondisclosure policy.

As for "customers" who establish a relationship with the institution, the FTC regulations require that the notice of the institution's policies and practices regarding disclosure of nonpublic personal information to nonaffiliated third parties be provided not later than the time when the customer relationship is established and annually thereafter during the pendency of the relationship.[13]

### [3]—Contents of Policies and Practices Notice

The notice required to be given to "consumers" and "customers" must provide notice of the institution's policies and practices regarding:

    (1) Disclosing nonpublic personal information to affiliates and nonaffiliated third parties, including the opt-out option for disclosures to non-affiliated third parties;

    (2) Disclosure of such information of persons who cease to be customers; and

    (3) Protection of the nonpublic personal information of consumers that it maintains.[14]

---

[11] *Compare*, G-L-B Act § 509(9), 15 U.S.C. § 6809(9); 16 C.F.R. § 313.3(e) ("consumer"), *with* G-L-B Act § 509(11), 15 U.S.C. § 6809(11); 16 C.F.R. § 313.3(h) ("customer"), *and* examples provided therein. See: 16 C.F.R. §§ 313.4(c)-(e) (examples and exceptions).

[12] 16 C.F.R. § 313.4(a)(2), (b).

[13] 16 C.F.R. § 313.4(a)(1). See 16 C.F.R. § 313.5 regarding annual notice.

[14] G-L-B Act 503, 15 U.S.C. § 6803, and model privacy form at 16 C.F.R. Part 313, App. A. See James B. Nutter & Co., 5 CCH Trade Reg. Rep. ¶ 16,298 (FTC 2009) (consent decree). See also, 16 C.F.R. § 313.6 (required information for notice) and Privacy Notice Online Form Builder, available at http://www.ftc.gov/opa/2010/04/glb.shtm (last visited Sept 13, 2010).

§ 1022.1

12 CFR Ch. X (1–1–21 Edition)

Bur. of Consumer [

APPENDIX A TO PART 1022 [RESERVED]
APPENDIX B TO PART 1022—MODEL NOTICES OF
FURNISHING NEGATIVE INFORMATION
APPENDIX C TO PART 1022—MODEL FORMS FOR
OPT-OUT NOTICES
APPENDIX D TO PART 1022—MODEL FORMS FOR
FIRM OFFERS OF CREDIT OR INSURANCE
APPENDIX E TO PART 1022—INTERAGENCY
GUIDELINES CONCERNING THE ACCURACY
AND INTEGRITY OF INFORMATION FUR-
NISHED TO CONSUMER REPORTING AGEN-
CIES
APPENDIXES F–G TO PART 1022 [RESERVED]
APPENDIX H TO PART 1022—MODEL FORMS FOR
RISK-BASED PRICING AND CREDIT SCORE
DISCLOSURE EXCEPTION NOTICES
APPENDIX I TO PART 1022—SUMMARY OF CON-
SUMER IDENTITY THEFT RIGHTS
APPENDIX J TO PART 1022 [RESERVED]
APPENDIX K TO PART 1022—SUMMARY OF CON-
SUMER RIGHTS
APPENDIX L TO PART 1022—STANDARDIZED
FORM FOR REQUESTING ANNUAL FILE DIS-
CLOSURES
APPENDIX M TO PART 1022—NOTICE OF FUR-
NISHER RESPONSIBILITIES
APPENDIX N TO PART 1022—NOTICE OF USER
RESPONSIBILITIES
APPENDIX O TO PART 1022—REASONABLE
CHARGES FOR CERTAIN DISCLOSURES

AUTHORITY: 12 U.S.C. 5512, 5581; 15 U.S.C.
1681a, 1681b, 1681c, 1681c–1, 1681e, 1681g, 1681i,
1681j, 1681m, 1681s, 1681s–2, 1681s–3, and 1681t;
Sec. 214, Public Law 108–159, 117 Stat. 1952.

SOURCE: 76 FR 79312, Dec. 21, 2011, unless
otherwise noted.

## Subpart A—General Provisions

### § 1022.1 Purpose, scope, and model forms and disclosures.

(a) *Purpose.* The purpose of this part
is to implement the Fair Credit Re-
porting Act (FCRA). This part gen-
erally applies to persons that obtain
and use information about consumers
to determine the consumer's eligibility
for products, services, or employment,
share such information among affili-
ates, and furnish information to con-
sumer reporting agencies.

(b) *Scope.* (1) [Reserved]

(2) *Institutions covered.* (i) Except as
otherwise provided in this part, this
part applies to any person subject to
the FCRA except for a person excluded
from coverage of this part by section
1029 of the Consumer Financial Protec-
tion Act of 2010, title X of the Dodd-
Frank Wall Street Reform and Con-
sumer Protection Act, Public Law 111-
203, 124 Stat. 1376.

518

(ii) For purposes of appendix B to
this part, financial institutions as de-
fined in section 509 of the Gramm-
Leach-Bliley Act (12 U.S.C. 6809), may
use the model notices in appendix B to
this part to comply with the notice re-
quirement in section 623(a)(7) of the
FCRA (15 U.S.C. 1681s–2(a)(7)).

(c) *Model forms and disclosures*—(1)
*Use.* Appendices D, H, I, K, L, M, and N
contain model forms and disclosures.
These appendices carry out the direc-
tive in FCRA that the Bureau prescribe
such model forms and disclosures. Use
or distribution of these model forms
and disclosures, or substantially simi-
lar forms and disclosures, will con-
stitute compliance with any section or
subsection of the FCRA requiring that
such forms and disclosures be used by
or supplied to any person.

(2) *Definition. Substantially similar*
means that all information in the Bu-
reau's prescribed model is included in
the document that is distributed, and
that the document distributed is for-
matted in a way consistent with the
format prescribed by the Bureau. The
document that is distributed shall not
include anything that interferes with,
detracts from, or otherwise undermines
the information contained in the Bu-
reau's prescribed model. Until January
1, 2013, the model forms in appendices
B, E, F, G, and H to 16 CFR part 698, as
those appendices existed as of October
1, 2011, are deemed substantially simi-
lar to the corresponding model forms
in appendices H, I, K, M, and N to this
part, and the model forms in appendix
H to 12 CFR part 222, as that appendix
existed as of October 1, 2011, are
deemed substantially similar to the
corresponding model forms in appendix
H to this part.

### § 1022.2 Examples.

The examples in this part are not ex-
clusive. Compliance with an example,
to the extent applicable, constitutes
compliance with this part. Examples in
a paragraph illustrate only the issue
described in the paragraph and do not
illustrate any other issue that may
arise in this part.

### § 1022.3 Definitions.

For purposes of this part, unless ex-
plicitly stated otherwise:

(a) *Act* means t
1681 *et seq.*).

(b) *Affiliate* mean
is related by con
common corporat
other company. F
iate of a Federal c
it union service
vided in 12 CFR p
trolled by the Fede

(c) [Reserved]

(d) *Common owne
porate control* mea
tween two compan

(1) One company
the other company

(i) Ownership, c
vote 25 percent o
standing shares of
security of a comp
rectly, or acting
other persons;

(ii) Control in a
election of a majo
trustees, or gener
viduals exercising
a company; or

(iii) The power
or indirectly, to
over the managem
company, as dete
cable prudential r
in 12 U.S.C. 5481(
presumed to have
ence over the ma
of a credit union
the credit union
67% owned by cre
there is no prude
Bureau; or

(2) Any other
spect to both com
described      in
through (d)(1)(iii).

(e) *Company* m
limited liability
trust, general pa
association, or si

(f) *Consumer* me

(g) *Identifying*
name or numbe
alone or in conju
information, to i
son, including an

(1) Name, soc
date of birth, of
ment issued driv
fication numbe
number, governm

ral Trade Commission, available [...] e FTC's Web site (ftc.gov/idtheft), ins valid and sufficient for this se.

) A consumer might provide a law 'cement report generated by an [...]nated system with a simple alle[...]n that an identity theft occurred [...]pport a request for a tradeline [...] or cessation of information fur[...]ng. In such a case, it would be rea[...]ble for an information furnisher or [...]mer reporting agency to ask the [...]consumer fill out and have note[...] the Bureau's Identity Theft Affi[...] or a similar form and provide [...] form of identification docu[...]ation.

) A consumer might provide a law 'cement report generated by an [...]mated system with a simple alle[...]n that an identity theft occurred [...]pport a request for an extended [...] alert. In this case, it would not [...]asonable for a consumer reporting [...]cy to require additional docu[...]ation or information, such as a [...]rized affidavit.

[Reserved]

*Medical information* means:

Information or data, whether oral [...]corded, in any form or medium, [...]ed by or derived from a health [...] provider or the consumer, that re[...] to:

The past, present, or future phys[...] mental, or behavioral health or [...]ition of an individual;

The provision of health care to an [...]idual; or

) The payment for the provision of [...]h care to an individual.

The term does not include:

The age or gender of a consumer;

) Demographic information about [...]consumer, including a consumer's [...]ence address or email address;

) Any other information about a [...]umer that does not relate to the [...]ical, mental, or behavioral health [...]ondition of a consumer, including [...]existence or value of any insurance [...]y; or

) Information that does not iden[...] specific consumer.

*Person* means any individual, part[...]ip, corporation, trust, estate co[...]ative, association, government or

governmental subdivision or agency, or other entity.

## Subpart B [Reserved]

## Subpart C—Affiliate Marketing

### §1022.20 Coverage and definitions.

(a) *Coverage.* Subpart C of this part applies to any person that uses information from its affiliates for the purpose of marketing solicitations, or provides information to its affiliates for that purpose, other than a person excluded from coverage of this part by section 1029 of the Consumer Financial Protection Act of 2010, title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, 124 Stat. 137.

(b) *Definitions.* For purposes of this subpart:

(1) *Clear and conspicuous.* The term "clear and conspicuous" means reasonably understandable and designed to call attention to the nature and significance of the information presented.

(2) *Concise*—(i) *In general.* The term "concise" means a reasonably brief expression or statement.

(ii) *Combination with other required disclosures.* A notice required by this subpart may be concise even if it is combined with other disclosures required or authorized by Federal or state law.

(3) *Eligibility information.* The term "eligibility information" means any information the communication of which would be a consumer report if the exclusions from the definition of "consumer report" in section 603(d)(2)(A) of the Act did not apply. Eligibility information does not include aggregate or blind data that does not contain personal identifiers such as account numbers, names, or addresses.

(4) *Pre-existing business relationship*— (i) *In general.* The term "pre-existing business relationship" means a relationship between a person, or a person's licensed agent, and a consumer based on:

(A) A financial contract between the person and the consumer which is in force on the date on which the consumer is sent a solicitation covered by this subpart;

(B) The purchase, rental, or lease by the consumer of the person's goods or services, or a financial transaction (including holding an active account or a policy in force or having another continuing relationship) between the consumer and the person, during the 18-month period immediately preceding the date on which the consumer is sent a solicitation covered by this subpart; or

(C) An inquiry or application by the consumer regarding a product or service offered by that person during the three-month period immediately preceding the date on which the consumer is sent a solicitation covered by this subpart.

(ii) *Examples of pre-existing business relationships.* (A) If a consumer has a time deposit account, such as a certificate of deposit, at a financial institution that is currently in force, the financial institution has a pre-existing business relationship with the consumer and can use eligibility information it receives from its affiliates to make solicitations to the consumer about its products or services.

(B) If a consumer obtained a certificate of deposit from a financial institution, but did not renew the certificate at maturity, the financial institution has a pre-existing business relationship with the consumer and can use eligibility information it receives from its affiliates to make solicitations to the consumer about its products or services for 18 months after the date of maturity of the certificate of deposit.

(C) If a consumer obtains a mortgage, the mortgage lender has a pre-existing business relationship with the consumer. If the mortgage lender sells the consumer's entire loan to an investor, the mortgage lender has a pre-existing business relationship with the consumer and can use eligibility information it receives from its affiliates to make solicitations to the consumer about its products or services for 18 months after the date it sells the loan, and the investor has a pre-existing business relationship with the consumer upon purchasing the loan. If, however, the mortgage lender sells a fractional interest in the consumer's loan to an investor but also retains an ownership interest in the loan, the

521

or later within the fifteen day period set forth in Paragraph (i)(1)(iii)(B) of this section.

(2) Examples of the specificity referenced in Paragraph (i)(1)(i) of this section are provided for illustrative purposes only, as follows:

(i) Specific dates relating to the identity theft such as when the loss or theft of personal information occurred or when the fraud(s) using the personal information occurred, and how the consumer discovered or otherwise learned of the theft.

(ii) Identification information or any other information about the perpetrator, if known.

(iii) Name(s) of information furnisher(s), account numbers, or other relevant account information related to the identity theft.

(iv) Any other information known to the consumer about the identity theft.

(3) Examples of when it would or would not be reasonable to request additional information or documentation referenced in Paragraph (i)(1)(iii) of this section are provided for illustrative purposes only, as follows:

(i) A law enforcement report containing detailed information about the identity theft and the signature, badge number or other identification information of the individual law enforcement official taking the report should be sufficient on its face to support a victim's request. In this case, without an identifiable concern, such as an indication that the report was fraudulent, it would not be reasonable for an information furnisher or consumer reporting agency to request additional information or documentation.

(ii) A consumer might provide a law enforcement report similar to the report in Paragraph (i)(1) of this section but certain important information such as the consumer's date of birth or Social Security number may be missing because the consumer chose not to provide it. The information furnisher or consumer reporting agency could accept this report, but it would be reasonable to require that the consumer provide the missing information. The Bureau's Identity Theft Affidavit is available on the Bureau's Web site (consumerfinance.gov/learnmore). The version of this form developed by the

Federal Trade Commission, available on the FTC's Web site (ftc.gov/idtheft), remains valid and sufficient for this purpose.

(iii) A consumer might provide a law enforcement report generated by an automated system with a simple allegation that an identity theft occurred to support a request for a tradeline block or cessation of information furnishing. In such a case, it would be reasonable for an information furnisher or consumer reporting agency to ask that the consumer fill out and have notarized the Bureau's Identity Theft Affidavit or a similar form and provide some form of identification documentation.

(iv) A consumer might provide a law enforcement report generated by an automated system with a simple allegation that an identity theft occurred to support a request for an extended fraud alert. In this case, it would not be reasonable for a consumer reporting agency to require additional documentation or information, such as a notarized affidavit.

(j) [Reserved]

(k) Medical information means:

(1) Information or data, whether oral or recorded, in any form or medium, created by or derived from a health care provider or the consumer, that relates to:

(i) The past, present, or future physical, mental, or behavioral health or condition of an individual;

(ii) The provision of health care to an individual; or

(iii) The payment for the provision of health care to an individual.

(2) The term does not include:

(i) The age or gender of a consumer;

(ii) Demographic information about the consumer, including a consumer's residence address or email address;

(iii) Any other information about a consumer that does not relate to the physical, mental, or behavioral health or condition of a consumer, including the existence or value of any insurance policy; or

(iv) Information that does not identify a specific consumer.

(l) Person means any individual, partnership, corporation, trust, estate cooperative, association, government or

(ii) For purposes of appendix B to this part, financial institutions as defined in section 509 of the Gramm-Leach-Bliley Act (12 U.S.C. 6809), may use the model notices in appendix B to this part to comply with the notice requirement in section 623(a)(7) of the FCRA (15 U.S.C. 1681s–2(a)(7)).

(c) *Model forms and disclosures*—(1) *Use.* Appendices D, H, I, K, L, M, and N contain model forms and disclosures. These appendices carry out the directive in FCRA that the Bureau prescribe such model forms and disclosures. Use or distribution of these model forms and disclosures, or substantially similar forms and disclosures, will constitute compliance with any section or subsection of the FCRA requiring that such forms and disclosures be used by or supplied to any person.

(2) *Definition. Substantially similar* means that all information in the Bureau's prescribed model is included in the document that is distributed, and that the document distributed is formatted in a way consistent with the format prescribed by the Bureau. The document that is distributed shall not include anything that interferes with, detracts from, or otherwise undermines the information contained in the Bureau's prescribed model. Until January 1, 2013, the model forms in appendices B, E, F, G, and H to 16 CFR part 698, as those appendices existed as of October 1, 2011, are deemed substantially similar to the corresponding model forms in appendices H, I, K, M, and N to this part, and the model forms in appendix H to 12 CFR part 222, as that appendix existed as of October 1, 2011, are deemed substantially similar to the corresponding model forms in appendix H to this part.

§ 1022.2 Examples.

The examples in this part are not exclusive. Compliance with this part, to the extent applicable, constitutes compliance with this part. Examples in a paragraph illustrate only the issue described in the paragraph and do not illustrate any other issue that may arise in this part.

§ 1022.3 Definitions.

For purposes of this part, unless explicitly stated otherwise:

8

(a) *Act* means the FCRA (15 U.S.C. 1681 *et seq.*).

(b) *Affiliate* means any company that is related by common ownership or common corporate control with another company. For example, an affiliate of a Federal credit union is a credit union service corporation, as provided in 12 CFR part 712, that is controlled by the Federal credit union.

(c) [Reserved]

(d) *Common ownership or common corporate control* means a relationship between two companies under which:

(1) One company has, with respect to the other company:

(i) Ownership, control, or power to vote 25 percent or more of the outstanding shares of any class of voting security of a company, directly or indirectly, or acting through one or more other persons;

(ii) Control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) of a company; or

(iii) The power to exercise, directly or indirectly, a controlling influence over the management or policies of a company, as determined by the applicable prudential regulator (as defined in 12 U.S.C. 5481(24)) (a credit union is presumed to have a controlling influence over the management or policies of a credit union service corporation if the credit union service corporation is 67% owned by credit unions) or, where there is no prudential regulator, by the Bureau; or

(2) Any other person has, with respect to both companies, a relationship described in paragraphs (d)(1)(i) through (d)(1)(ii).

(e) *Company* means any corporation, limited liability company, business trust, general or limited partnership, association, or similar organization.

(f) *Consumer* means an individual.

(g) *Identifying information* means any name or number that may be used, alone or in conjunction with any other information, to identify a specific person, including any:

(1) Name, social security number, date of birth, official state or government issued driver's license or identification number, alien registration number, government passport number,

employer or taxpayer identification number;

(2) Unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;

(3) Unique electronic identification number, address, or routing code; or

(4) Telecommunication identifying information or access device (as defined in 18 U.S.C. 1029(e)).

(h) *Identity theft* means a fraud committed or attempted using the identifying information of another person without authority.

(i)(1) *Identity theft report* means a report:

(i) That alleges identity theft with as much specificity as the consumer can provide;

(ii) That is a copy of an official, valid report filed by the consumer with a Federal, state, or local law enforcement agency, including the United States Postal Inspection Service, the filing of which subjects the person filing the report to criminal penalties relating to the filing of false information, if, in fact, the information in the report is false; and

(iii) That may include additional information or documentation that an information furnisher or consumer reporting agency reasonably requests for the purpose of determining the validity of the alleged identity theft, provided that the information furnisher or consumer reporting agency:

(A) Makes such request not later than fifteen days after the date of receipt of the copy of the report form identified in Paragraph (i)(1)(ii) of this section or the request by the consumer for the particular service, whichever shall be the later;

(B) Makes any supplemental requests for information or documentation and final determination on the acceptance of the identity theft report within another fifteen days after its initial request for information or documentation; and

(C) Shall have five days to make a final determination on the acceptance of the identity theft report, in the event that the consumer reporting agency or information furnisher receives any such additional information or documentation on the eleventh day

519

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 7



| 106TH CONGRESS<br>*1st Session* | HOUSE OF REPRESENTATIVES | REPT. 106–341<br>Part 1 |
|---|---|---|

## ELECTRONIC SIGNATURES IN GLOBAL AND NATIONAL COMMERCE ACT

SEPTEMBER 27, 1999.—Ordered to be printed

Mr. BLILEY, from the Committee on Commerce,
submitted the following

## R E P O R T

[To accompany H.R. 1714]

[Including cost estimate of the Congressional Budget Office]

The Committee on Commerce, to whom was referred the bill
(H.R. 1714) to facilitate the use of electronic records and signatures
in interstate or foreign commerce, having considered the same, re-
port favorably thereon with an amendment and recommend that
the bill as amended do pass.

### CONTENTS

| | Page |
|---|---|
| Amendment | 2 |
| Purpose and Summary | 5 |
| Background and Need for Legislation | 6 |
| Hearings | 10 |
| Committee Consideration | 10 |
| Committee Votes | 10 |
| Committee Oversight Findings | 11 |
| Committee on Government Reform Oversight Findings | 11 |
| New Budget Authority, Entitlement Authority, and Tax Expenditures | 11 |
| Committee Cost Estimate | 11 |
| Congressional Budget Office Estimate | 11 |
| Federal Mandates Statement | 12 |
| Advisory Committee Statement | 12 |
| Constitutional Authority Statement | 13 |
| Applicability to Legislative Branch | 13 |
| Section-by-Section Analysis of the Legislation | 13 |
| Changes in Existing Law Made by the Bill, as Reported | 19 |

69–006

2

## AMENDMENT

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

SECTION 1. SHORT TITLE.

This Act may be cited as the "Electronic Signatures in Global and National Commerce Act".

# TITLE I—VALIDITY OF ELECTRONIC RECORDS AND SIGNATURES FOR COMMERCE

SEC. 101. GENERAL RULE OF VALIDITY.

(a) GENERAL RULE.—With respect to any contract or agreement entered into in or affecting interstate or foreign commerce, notwithstanding any statute, regulation, or other rule of law, the legal effect, validity, or enforceability of such contract or agreement shall not be denied—

(1) on the ground that the contract or agreement is not in writing if the contract or agreement is an electronic record; or

(2) on the ground that the contract or agreement is not signed or is not affirmed by a signature if the contract or agreement is signed or affirmed by an electronic signature.

(b) AUTONOMY OF PARTIES IN COMMERCE.—With respect to any contract or agreement entered into in or affecting interstate or foreign commerce—

(1) the parties to such contract or agreement may establish procedures or requirements regarding the use and acceptance of electronic records and electronic signatures acceptable to such parties; and

(2) the legal effect, validity, or enforceability of such contract or agreement shall not be denied because of the type or method of electronic record or electronic signature selected by the parties in establishing such procedures or requirements.

SEC. 102. AUTHORITY TO ALTER OR SUPERSEDE GENERAL RULE.

(a) PROCEDURE TO ALTER OR SUPERSEDE.—Except as provided in subsection (b), a State statute, regulation, or other rule of law enacted or adopted after the date of enactment of this Act may modify, limit, or supersede the provisions of section 101 if such statute, regulation, or rule of law—

(1)(A) constitutes an enactment or adoption of the Uniform Electronic Transactions Act as reported to the State legislatures by the National Conference of Commissioners on Uniform State Laws; or

(B) specifies the alternative procedures or requirements for the use or acceptance of electronic records or electronic signatures to establish the legal effect, validity, or enforceability of contracts or agreements;

(2) is enacted or adopted within 4 years after the date of enactment of this Act; and

(3) makes specific reference to the provisions of section 101.

(b) LIMITATIONS ON ALTERATION OR SUPERSESSION.—A State statute, regulation, or other rule of law (including an insurance statute, regulation, or other rule of law), regardless of its date of enactment or adoption, that modifies, limits, or supersedes section 101 shall not be effective to the extent that such statute, regulation, or rule—

(1) discriminates in favor of or against a specific technology, method, or technique of creating, storing, generating, receiving, communicating, or authenticating electronic records or electronic signatures;

(2) discriminates in favor of or against a specific type or size of entity engaged in the business of facilitating the use of electronic records or electronic signatures;

(3) is based on procedures or requirements that are not specific or that are not publicly available; or

(4) is otherwise inconsistent with the provisions of section 101.

(c) ACTIONS TO ENJOIN.—Whenever it shall appear to the Secretary of Commerce that a State has enacted or adopted a statute, regulation, or other rule of law that is prohibited by subsection (b), the Secretary may bring an action to enjoin the enforcement of such statute, regulation, or rule, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.

3

**SEC. 103. SPECIFIC EXCLUSIONS.**

The provisions of section 101 shall not apply to—
(1) a statute, regulation, or other rule of law governing the creation and execution of wills, codicils, or testamentary trusts; or
(2) a statute, regulation, or other rule of law governing adoption, divorce, or other matters of family law.

**SEC. 104. DEFINITIONS.**

For purposes of this title:
(1) ELECTRONIC RECORD.—The term "electronic record" means a writing, document, or other record created, stored, generated, received, or communicated by electronic means.
(2) ELECTRONIC SIGNATURE.—The term "electronic signature" means information or data in electronic form, attached to or logically associated with an electronic record by a person or an electronic agent, that is intended by a party to signify agreement to a contract or agreement.
(3) ELECTRONIC.—The term "electronic" means of or relating to technology having electrical, digital, magnetic, optical, electromagnetic, or similar capabilities regardless of medium.
(4) ELECTRONIC AGENT.—The term "electronic agent" means a computer program or an electronic or other automated means used independently to initiate an action or respond to electronic records in whole or in part without review by an individual at the time of the action or response.

## TITLE II—DEVELOPMENT AND ADOPTION OF ELECTRONIC SIGNATURE PRODUCTS AND SERVICES

**SEC. 201. TREATMENT OF ELECTRONIC SIGNATURES IN INTERSTATE AND FOREIGN COMMERCE.**

(a) INQUIRY REGARDING IMPEDIMENTS TO COMMERCE.—
(1) INQUIRIES REQUIRED.—Within 90 days after the date of the enactment of this Act, and annually thereafter, the Secretary of Commerce, acting through the Assistant Secretary for Communications and Information, shall complete an inquiry to—
(A) identify any domestic and foreign impediments to commerce in electronic signature products and services and the manners in which and extent to which such impediments inhibit the development of interstate and foreign commerce;
(B) identify constraints imposed by foreign nations or international organizations that constitute barriers to providers of electronic signature products or services; and
(C) identify the degree to which other nations and international organizations are complying with the principles in subsection (b)(2).
(2) SUBMISSION.—The Secretary shall submit a report to the Congress regarding the results of each such inquiry within 90 days after the conclusion of such inquiry.

(b) PROMOTION OF ELECTRONIC SIGNATURES.—
(1) REQUIRED ACTIONS.—The Secretary of Commerce, acting through the Assistant Secretary for Communications and Information, shall promote the acceptance and use, on an international basis, of electronic signatures in accordance with the principles specified in paragraph (2) and in a manner consistent with section 101 of this Act. The Secretary of Commerce shall take all actions necessary in a manner consistent with such principles to eliminate or reduce, to the maximum extent possible, the impediments to commerce in electronic signatures, including those identified in the inquiries under subsection (a) for the purpose of facilitating the development of interstate and foreign commerce.
(2) PRINCIPLES.—The principles specified in this paragraph are the following:
(A) Free markets and self-regulation, rather than government standard-setting or rules, should govern the development and use of electronic records and electronic signatures.
(B) Neutrality and nondiscrimination should be observed among providers of and technologies for electronic records and electronic signatures.
(C) Parties to a transaction should be permitted to establish requirements regarding the use of electronic records and electronic signatures acceptable to such parties.

4

(D) Parties to a transaction—

(i) should be permitted to determine the appropriate authentication technologies and implementation models for their transactions, with assurance that those technologies and implementation models will be recognized and enforced; and

(ii) should have the opportunity to prove in court or other proceedings that their authentication approaches and their transactions are valid.

(E) Electronic records and electronic signatures in a form acceptable to the parties should not be denied legal effect, validity, or enforceability on the ground that they are not in writing.

(F) De jure or de facto imposition of standards on private industry through foreign adoption of regulations or policies with respect to electronic records and electronic signatures should be avoided.

(G) Paper-based obstacles to electronic transactions should be removed.

(c) FOLLOWUP STUDY.—Within 5 years after the date of enactment of this Act, the Secretary of Commerce, acting through the Assistant Secretary for Communications and Information, shall conduct an inquiry regarding any State statutes, regulations, or other rules of law enacted or adopted after such date of enactment pursuant to section 102(a), and the extent to which such statutes, regulations, and rules comply with section 102(b). The Secretary shall submit a report to the Congress regarding the results of such inquiry by the conclusion of such 5 year period and such report shall identify any actions taken by the Secretary pursuant to section 102(c) and subsection (b) of this section.

(d) CONSULTATION.—In conducting the activities required by this section, the Secretary shall consult with users and providers of electronic signature products and services and other interested persons.

(e) PRIVACY.—Nothing in this section shall be construed to require the Secretary or the Assistant Secretary to take any action that would adversely affect the privacy of consumers.

(f) DEFINITIONS.—As used in this section, the terms "electronic record" and "electronic signature" have the meanings provided in section 104 of the Electronic Signatures in Global and National Commerce Act.

## TITLE III—USE OF ELECTRONIC RECORDS AND SIGNATURES UNDER FEDERAL SECURITIES LAW

SEC. 301. GENERAL VALIDITY OF ELECTRONIC RECORDS AND SIGNATURES.

Section 3 of the Securities Exchange Act of 1934 (15 U.S.C. 78c) is amended by adding at the end the following new subsection:

"(h) REFERENCES TO WRITTEN RECORDS AND SIGNATURES.—

"(1) GENERAL VALIDITY OF ELECTRONIC RECORDS AND SIGNATURES.—Except as otherwise provided in this subsection—

"(A) if a contract, agreement, or record (as defined in subsection (a)(37)) is required by the securities laws or any rule or regulation thereunder (including a rule or regulation of a self-regulatory organization), and is required by other Federal or State statute, regulation, or other rule of law to be in writing, the legal effect, validity, or enforceability of such contract, agreement, or record shall not be denied on the ground that the contract, agreement, or record is not in writing if the contract, agreement, or record is an electronic record;

"(B) if a contract, agreement, or record is required by the securities laws or any rule or regulation thereunder (including a rule or regulation of a self-regulatory organization), and is required by other Federal or State statute, regulation, or other rule of law to be signed, the legal effect, validity, or enforceability of such contract, agreement, or record shall not be denied on the ground that such contract, agreement, or record is not signed or is not affirmed by a signature if the contract, agreement, or record is signed or affirmed by an electronic signature; and

"(C) if a broker, dealer, transfer agent, investment adviser, or investment company enters into a contract or agreement with, or accepts a record from, a customer or other counterparty, such broker, dealer, transfer agent, investment adviser, or investment company may accept and rely upon an electronic signature on such contract, agreement, or record, and such elec-

5

tronic signature shall not be denied legal effect, validity, or enforceability because it is an electronic signature.

"(2) IMPLEMENTATION.—

"(A) REGULATIONS.—The Commission may prescribe such regulations as may be necessary to carry out this subsection consistent with the public interest and the protection of investors.

"(B) NONDISCRIMINATION.—The regulations prescribed by the Commission under subparagraph (A) shall not—

"(i) discriminate in favor of or against a specific technology, method, or technique of creating, storing, generating, receiving, communicating, or authenticating electronic records or electronic signatures; or

"(ii) discriminate in favor of or against a specific type or size of entity engaged in the business of facilitating the use of electronic records or electronic signatures.

"(3) EXCEPTIONS.—Notwithstanding any other provision of this subsection—

"(A) the Commission, an appropriate regulatory agency, or a self-regulatory organization may require that records be filed in a specified electronic format or formats if the records are required to be submitted to the Commission, an appropriate regulatory agency, or a self-regulatory organization, respectively; and

"(B) the Commission may require that contracts, agreements, or records relating to purchases and sales, or establishing accounts for conducting purchases and sales, of penny stocks be manually signed, and may require such manual signatures with respect to transactions in similar securities if the Commission determines that such securities are susceptible to fraud and that such fraud would be deterred or prevented by requiring manual signatures.

"(4) RELATION TO OTHER LAW.—The provisions of this subsection apply in lieu of the provisions of title I of the Electronic Signatures in Global and National Commerce Act to a contract, agreement, or record (as defined in subsection (a)(37)) that is required by the securities laws.

"(5) DEFINITIONS.—As used in this subsection:

"(A) ELECTRONIC RECORD.—The term 'electronic record' means a writing, document, or other record created, stored, generated, received, or communicated by electronic means.

"(B) ELECTRONIC SIGNATURE.—The term 'electronic signature' means information or data in electronic form, attached to or logically associated with an electronic record, that is intended by a party to signify agreement to a contract or agreement.

"(C) ELECTRONIC.—The term 'electronic' means of or relating to technology having electrical, digital, magnetic, optical, electromagnetic, or similar capabilities regardless of medium.".

## PURPOSE AND SUMMARY

The purpose of H.R. 1714, the Electronic Signatures in Global and National Commerce Act, is to facilitate the use and acceptance of electronic signatures and records in interstate and foreign commerce. The legislation is narrowly drawn so as to remove barriers to the use and acceptance of electronic signatures and records without establishing a regulatory framework that would hinder the growth of electronic commerce. The bill adds greater legal certainty and predictability to electronic commerce by according the same legal effect, validity, and enforceability to electronic signatures and records as are accorded written signatures and records. Such certainty, in turn, will further contribute to the growth of electronic commerce.

H.R. 1714 provides that with respect to any contract or agreement entered into in or affecting interstate commerce, the legal effect, validity, and enforceability of such contract or agreement shall not be denied on the ground that: (1) the contract or agreement is not in writing if the contract or agreement is an electronic record; and (2) the contract or agreement is not signed or is not affirmed

7

a pre-existing business relationship and do not meet face-to-face. Thus, traditional methods of identifying a party and conducting a legally binding transaction can be completely absent. Once the identity of the parties has been established, it is important that the online transaction take place in a secure environment to ensure the authenticity and integrity of the transmission and that a record of the transmission is retained should any dispute arise in the future. Technology, such as electronic signatures, is providing a solution and resolving many of the complex issues involved in online commercial transactions.

In discussing the greater security that electronic signatures provides to online transactions, the General Counsel of Charles Schwab & Co., Inc., testified that "[o]ur belief is that electronic signature technology is actually more secure against forgery than pen and ink signatures." (Testimony of W. Hardy Callcott, Senior Vice President and General Counsel, Charles Schwab & Co., Inc., at the June 24, 1999, hearing before the Subcommittee on Finance and Hazardous Materials, Serial No. 106–33, p. 33.)

An electronic signature is the digital equivalent of a handwritten signature. It is a generic term that describes a variety of methods by which an individual can sign an electronic record. Electronic signatures can range from simply typing a name at the end of an e-mail message, to a digital signature; to a unique biometric identifier such as a fingerprint or iris scan.[1] An electronic signature, like a written signature, is a symbol that signifies intent—intent that varies depending on context, such as a signature on a contract shows intent that the parties agree to be bound by the terms of that contract. At present, no technology or model for electronic signatures has established itself as the market leader. Accordingly, the Committee believes it is important that the legislation, and any State legislation as well, not favor one technology or model over another.

The issues the bill primarily addresses are whether an electronic signature has the same legal effect as a written signature and whether an electronic record satisfies the legal requirement that communications be in writing. Today, the legal effect of an electronic record or an electronic signature is uncertain due to the lack of specific affirmative statutes recognizing the equivalency of electronic signatures and records to written signatures and records. Moreover, some courts have not recognized this equivalency. See *Georgia Department of Transportation v. Norris*, 222 Ga.App. 361, 474 S.E.2d (1996) and *Roos v. Aloi*, 127 Misc. 2d 864, 487 N.Y.S.2d 637 (Sup. Ct. 1985).

To address the legal uncertainty of an electronic signature and an electronic record, over the past four years, States have enacted statutes that provide for the use and acceptance of electronic signatures in certain transactions. To date, forty-four States have enacted some sort of electronic signature legislation. No two States have enacted identical legislation, however, leading to a patchwork of inconsistent and conflicting State laws governing electronic signatures and records.

---

[1] The term digital signature, while often used interchangeably with electronic signature, technically refers to a specific type of electronic signature that involves the use of public-key/private-key encryption technology.

6

by a signature if the contract or agreement is signed or affirmed by an electronic signature. H.R. 1714 provides broad authority to the States to modify, limit, or supersede section 101 of the bill within four years of enactment, provided that any modification complies with certain minimum standards and principles appropriate for interstate commerce.

In addition, the bill directs the Secretary of Commerce to promote the acceptance internationally of electronic signatures and electronic signature products.

The bill also separately addresses securities transactions. It provides an exclusive Federal regulatory scheme for the use of electronic signatures and records in connection with contracts, agreements, or records that are required the securities laws. It amends the Federal securities laws to provide that a contract, agreement, or record that is required by the Federal securities laws, and is required by any other Federal or State provision to be in writing or to be signed, shall not be denied legal effect, validity, or enforceability on the ground that it is not in writing if it is an electronic record or not signed if it is signed or affirmed by an electronic signature.

## BACKGROUND AND NEED FOR LEGISLATION

The creation and growth of the Internet has been one of the most important developments of the second half of the 20th century. The Internet has evolved from its origins as an academic research tool in the late 1960s to a global communications, information, entertainment, and commercial medium. The widespread availability of inexpensive yet powerful personal computers has made the Internet accessible to hundreds of millions of people around the world.

Increasingly, the Internet is being used to conduct commercial activities, not only among businesses, but between businesses and consumers. The use of the Internet to conduct commercial activities is often referred to as "electronic commerce." A wide range of telecommunications networks can be used to conduct electronic commerce. However, the Internet is the most commonly cited network used to conduct electronic commerce. The growth of electronic commerce has been stunning. In 1996, consumers spent just $2.6 billion in online transactions, while in 1998, consumers spent over $32 billion in online transactions, with over $3 billion in consumer sales occurring during the December holiday shopping season alone. In its infancy, electronic commerce was mostly limited to small purchase items, such as books, music CDs, and airplane tickets. Recently, however, online transactions are growing larger and more complex. Individuals can now manage their retirement portfolios, purchase an automobile or life insurance, or search for a home mortgage online among other major transactions.

Electronic commerce transactions raise a number of new issues. First, how does one authenticate the parties to a transaction and then ensure that the transaction takes place in a secure environment? Second, what is the legal status of an online transaction?

The first issue involves determining the identity of the parties to a transaction so that the parties are certain that they are dealing with the correct individuals. Today, a large percentage of electronic commerce retail transactions are between parties that do not have

8

These State laws vary in a number of ways. Some State statutes, such as those in Utah and Washington, provide legal validity only to electronic documents that were signed using digital signature technology, while other State statutes, such as that in Virginia, provide legal validity to an electronic document that was signed using any type of electronic signature technology. Other States, such as Maryland and Indiana, only permit the use and acceptance of electronic signatures and records between government agencies or between an individual and a government agency.

In an attempt to bring uniformity to the legal status of electronic signatures and records, in late July 1999, the National Conference of Commissioners on Uniform State Laws (NCCUSL) adopted the Uniform Electronic Transactions Act (UETA). The purpose of this model legislation is to provide for a uniform, nationwide standard for the use and acceptance of electronic records and electronic signatures. Efforts will now be made to have State legislatures adopt UETA.

Past efforts to enact uniform laws have yielded uneven results. The Uniform Partnership Act, adopted in 1996, has been enacted by just nineteen States. Only four States have enacted the Uniform Limited Liability Company Act, adopted in 1995. In contrast, the Uniform Limited Partnership Act, adopted in 1976, has been enacted by all but one State.

The Committee commends NCCUSL's work on the UETA. Both UETA and H.R. 1714 share many of the same basic principles. The Committee remains concerned, however, about the prospects for adoption of UETA by the States. Failure to adopt UETA by a substantial majority of the States in a short time period will perpetuate the patchwork of inconsistent and conflicting State laws. Further, some States will inevitably choose not to follow the work of NCCUSL on electronic signatures and will develop their own standards, which may or may not be compatible with UETA or may even be harmful to the development of electronic signatures if designed or implemented incorrectly.

There is, therefore, a clear need for a uniform, nationwide legal standard to be in place until States have the opportunity to enact their own laws or to ensure that there is a nationwide legal standard in case States fail to or refuse to enact their own electronic signature legislation. H.R. 1714 fills this need. By removing the uncertainty over the legal effect, validity, or enforceability of electronic signatures and records, electronic commerce will have the opportunity to reach its full potential. By adding greater legal certainty and predictability to electronic transactions, consumers' understanding and confidence in and use of those transactions will grow. Further, companies now developing electronic signatures and structures for their use will have the necessary legal framework in place to focus their attention on proving their technology in the marketplace.

In stressing the importance of uniformity, the General Counsel of Charles Schwab & Co., Inc., testified that "[t]oday's securities markets are national in scope and involve transactions that are entirely interstate in nature. * * * For that reason consistent uniform Federal standards are really imperative if brokers and others in the securities industry are going to be able to engage in elec-

9

tronic commerce with certainty or liability." (Testimony of W.
Hardy Callcott, Senior Vice President and General Counsel,
Charles Schwab & Co., Inc., at the June 24, 1999, hearing before
the Subcommittee on Finance and Hazardous Materials, Serial No.
106–33, p. 9.)

The legal uncertainty regarding electronic records and signatures
is significant in the securities industry today as investors turn in-
creasingly to the Internet to conduct their financial transactions.
As online securities transactions are almost exclusively interstate
in nature, the need for uniformity in electronic signature laws be-
comes clear. Title III of the bill addresses these issues. Recent sta-
tistics have shown that online trading now accounts for nearly one
of every seven equity trades (about 14 percent) and is growing rap-
idly, with an increase of over 34 percent in online activity in the
last quarter over the previous quarter. Market participants such as
brokers and investors would like to eliminate the need for any
paper documents to complete their electronic transactions in order
to improve the efficiency and convenience of online securities in-
vesting. Under current law, the Federal Arbitration Act generally
requires that arbitration agreements need to be in writing to be en-
forceable. This requirement means that, when trying to set up an
account at an electronic broker, the online broker has to mail or fax
the account agreement (which usually contains an arbitration
agreement) to the customer for physical signature. H.R. 1714 elimi-
nates the need for such a physical signature by making it possible
to execute a valid account agreement electronically. Customers who
wish to do business electronically would also like certainty that
State law will recognize the validity of electronic contracts, agree-
ments, or records (and signatures thereon) in connection with secu-
rities activities such as opening a brokerage account. H.R. 1714
provides that legal certainty in the context of securities trans-
actions by providing a uniform Federal law governing the use of
electronic contracts, agreements, and records, and signatures there-
on, preempting contrary State law.

Increasingly, online transactions are not just interstate but inter-
national in nature. The Committee recognizes the need for inter-
national recognition of electronic signatures and records that will
not create barriers to international trade. Unfortunately, inter-
national developments on recognizing electronic signatures are
troubling. The German Digital Signature Law of July 1997 runs
counter to many of the widely accepted principles of electronic sig-
nature law in the United States. For example, the German law pro-
vides legal recognition only to signatures generated using digital
signature technology, establishes licensing for certificate authori-
ties, and sets a substantial role for the government in establishing
technical standards. Further, a position paper on international rec-
ognition of electronic signatures released by the German govern-
ment (International Legal Recognition of Digital Signatures, Au-
gust 28, 1998) seeks to apply these principles internationally. This
policy statement reemphasizes the principle that uniform security
standards are necessary for all uses of digital signatures regardless
of their use, supports mutual recognition of digital signatures only
to those nations which have a similar regulatory structure for cer-
tification authority, and fails to provide legal effect to electronic

10

signatures generated by other technologies. In addition, the Committee is concerned that the European Union's draft Electronic Signature Directive, while not as narrowly drawn as the German legislation, still favors digital signature technology and provides a regulatory framework for the licensing of certification authorities.

### HEARINGS

The Subcommittee on Telecommunications, Trade and Consumer Protection held a hearing on H.R. 1714 on June 9, 1999. The Subcommittee received testimony from the following witnesses: Mr. Andrew J. Pincus, General Counsel, United States Department of Commerce; The Honorable Donald W. Upson, Secretary of Technology, Commonwealth of Virginia; Mr. Jeffery Skogen, Internet Market Manager, Ford Motor Credit Company; Mr. Daniel J. Greenwood, Esq., Deputy General Counsel, Information Technology Division, Commonwealth of Massachusetts; Mr. Ari Engelberg, Vice President, Stamps.com, Inc.; Mr. John E. Siedlarz, President and CEO, IriScan, Inc., testifying on behalf of the International Biometric Industry Association; and Mr. Christopher T. Curtis, Associate General Counsel, Capital One Financial Corporation.

The Subcommittee on Finance and Hazardous Materials held a hearing on H.R. 1714 on June 24, 1999. The Subcommittee received testimony from the following witnesses: Mr. W. Hardy Callcott, Senior Vice President and General Counsel, Charles Schwab & Co., Inc.; Mr. Michael J. Hogan, Senior Vice President and General Counsel, DLJdirect Inc.; and Mr. Thomas C. Quick, President and Chief Operating Officer, Quick & Reilly/Fleet Securities, Inc..

### COMMITTEE CONSIDERATION

On July 21, 1999, the Subcommittee on Finance and Hazardous Materials met in open markup session and approved H.R. 1714, the Electronic Signatures in Global and National Commerce Act, for Full Committee consideration, amended, by a voice vote. On July 29, 1999, the Subcommittee on Telecommunications, Trade, and Consumer Protection met in open markup session and approved H.R. 1714, the Electronic Signatures in Global and National Commerce Act, for Full Committee consideration, amended, by a voice vote.

On August 5, 1999, the Full Committee met in open markup session and ordered H.R. 1714 reported to the House, amended, by a voice vote, a quorum being present.

### COMMITTEE VOTES

Clause 3(b) of rule XIII of the Rules of the House requires the Committee to list the record votes on the motion to report legislation and amendments thereto. There were no record votes taken in connection with ordering H.R. 1714 reported. An Amendment in the Nature of a Substitute offered by Mr. Bliley, No. 1, to: (1) clarify the party autonomy provision so that a contract or agreement by parties is provided legal effect, validity and enforceability; (2) further clarify the definition of an electronic signature; (3) include the concept of electronic agents in the definition of electronic signa-

11

ture; and (4) expand the principles for international negotiations contained in Title II to include (a) removal of paper-based obstacles to electronic transactions and (b) a provision that parties should have the opportunity to prove in court that their authentication methods and transactions are valid, was agreed to by a voice vote. A motion by Mr. Bliley to order H.R. 1714 reported to the House, amended, was agreed to by a voice vote, a quorum being present.

### COMMITTEE OVERSIGHT FINDINGS

Pursuant to clause 3(c)(1) of rule XIII of the Rules of the House of Representatives, the Committee held two legislative hearings and made findings that are reflected in this report.

### COMMITTEE ON GOVERNMENT REFORM OVERSIGHT FINDINGS

Pursuant to clause 3(c)(4) of rule XIII of the Rules of the House of Representatives, no oversight findings have been submitted to the Committee by the Committee on Government Reform.

### NEW BUDGET AUTHORITY, ENTITLEMENT AUTHORITY, AND TAX EXPENDITURES

In compliance with clause 3(c)(2) of rule XIII of the Rules of the House of Representatives, the Committee finds that H.R. 1714, the Electronic Signatures in Global and National Commerce Act, would result in no new or increased budget authority, entitlement authority, or tax expenditures or revenues.

### COMMITTEE COST ESTIMATE

The Committee adopts as its own the cost estimate prepared by the Director of the Congressional Budget Office pursuant to section 402 of the Congressional Budget Act of 1974.

### CONGRESSIONAL BUDGET OFFICE ESTIMATE

Pursuant to clause 3(c)(3) of rule XIII of the Rules of the House of Representatives, the following is the cost estimate provided by the Congressional Budget Office pursuant to section 402 of the Congressional Budget Act of 1974:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, August 20, 1999.*

Hon. TOM BLILEY,
*Chairman, Committee on Commerce,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has prepared the enclosed cost estimate for H.R. 1714, the Electronic Signatures of Global and National Commerce Act.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contacts are Shelley Finlayson (for the state and local impact), and Mark Hadley (for federal costs).

Sincerely,

BARRY B. ANDERSON
(For Dan L. Crippen, Director).

Enclosure.

12

*H.R. 1714—Electronic Signatures in Global and National Commerce Act*

H.R. 1714 would preempt state laws that regulate interstate commercial transactions conducted via electronic means (such as contracts with electronic signatures), unless states enact uniform standards equivalent to those specified in the bill. Such a preemption constitutes an intergovernmental mandate as defined in the Unfunded Mandates Reform Act (UMRA), but CBO estimates that the costs would not be significant and would not exceed the threshold established by the act ($50 million in 1996, adjusted annually for inflation). The bill contains no new private-sector mandates as defined in UMRA.

The bill also would require the Department of Commerce to submit an annual report detailing foreign and domestic impediments to commerce in products using electronic signatures. The bill would direct the department to promote the international acceptance and use of electronic signatures, and to submit a report within three years regarding actions by states to allow electronic signatures in commerce. Finally, H.R. 1714 would amend the Securities and Exchange Act of 1934 to address the use of electronic signatures under federal securities law.

Based on information from the Department of Commerce and the Securities and Exchange Commission, CBO estimates implementing the bill would cost about $1 million a year, subject to the availability of appropriated funds. H.R. 1714 would not affect direct spending or receipts; therefore, pay-as-you-go procedures would not apply.

On June 30, 1999, CBO transmitted a cost estimate for S. 761, the Third Millennium Digital Commerce Act, as ordered reported by the Senate Committee on Commerce, Science, and Transportation on June 23, 1999. CBO estimated that implementing S. 761 would cost about $500,000 a year. The lower cost is largely a result of the difference in the scope and length of the study that the Department of Commerce would be required to prepare and submit to the Congress.

The CBO staff contacts are Shelley Finlayson (for the state and local impact), and Mark Hadley (for federal costs). This estimate was approved by Robert A. Sunshine, Deputy Assistant Director for Budget Analysis.

FEDERAL MANDATES STATEMENT

The Committee adopts as its own the estimate of Federal mandates prepared by the Director of the Congressional Budget Office pursuant to section 423 of the Unfunded Mandates Reform Act.

ADVISORY COMMITTEE STATEMENT

No advisory committees within the meaning of section 5(b) of the Federal Advisory Committee Act were created by this legislation.

13

Pursuant to clause 3(d)(1) of rule XIII of the Rules of the House of Representatives, the Committee finds that the Constitutional authority for this legislation is provided in Article I, section 8, clause 3, which grants Congress the power to regulate commerce with foreign nations, among the several States, and with the Indian tribes.

### APPLICABILITY TO LEGISLATIVE BRANCH

The Committee finds that the legislation does not relate to the terms and conditions of employment or access to public services or accommodations within the meaning of section 102(b)(3) of the Congressional Accountability Act.

### SECTION-BY-SECTION ANALYSIS OF THE LEGISLATION

*Section 1. Short title*

Section 1 establishes the short title of the bill as the "Electronic Signatures in Global and National Commerce Act."

### TITLE I—VALIDITY OF ELECTRONIC RECORDS AND SIGNATURES FOR COMMERCE

*Section 101. General rule of validity*

Section 101(a) establishes a general rule that, with respect to any contract or agreement affecting interstate commerce, notwithstanding any statute, regulation or other rule of law, the legal effect, validity, and enforceability of such contract or agreement shall not be denied on the ground that: (1) the contract or agreement is not in writing if the contract or agreement is an electronic record; and (2) the contract or agreement is not signed or affirmed by a written signature if the contract or agreement is signed or affirmed by an electronic signature.

Section 101(b) provides that with respect to contracts or agreements affecting interstate commerce, the parties to such contracts or agreements may establish procedures or requirements regarding the use and acceptance of electronic records and electronic signatures acceptable to such parties. Further, the legal effect, validity, or enforceability of such contracts or agreements shall not be denied because of the type or method of electronic record or electronic signature selected by the parties.

The Committee intends that section 101(b) cover a broad range of interstate commercial transactions and that Federal agencies cooperate in that effort. It is the Committee's intent that, under section 101(b), a Federal agency not enforce or adopt a regulation that denies legal effect to a contract or agreement between private parties in a regulated industry or an industry that benefits from Federal support on the ground that the contract or agreement is an electronic record or is signed by an electronic signature. Similarly, a Federal agency should not require the use of a particular technology or provider for electronic records or electronic signatures on documents between private parties in a regulated industry or an industry that benefits from Federal support. In general, however, the Committee does intend for section 101(b) to have an impact on

14

legitimate regulatory recordkeeping requirements of Federal agencies, such as ensuring the accuracy of, and access to, electronic records.

One example of a transaction that is covered under section 101(b) is the use of the Internet by individuals to change their pre-subscribed telecommunications carrier. The Federal Communications Commission should consider allowing the use of electronic signatures as an additional method of verifying a Primary Interexchange Carrier (PIC) change. Use of electronic signatures to presubscribe voluntarily to basic telecommunications services can benefit both consumers and telecommunications providers.

In addition, the Committee intends that the parties may enter into a contract or agreement to receive any records related to such contract or agreement, including but not limited to notices, disclosures, booklets, or other information required under applicable Federal or State law.

Nothing in section 101(b) requires a party to enter into any contract or agreement utilizing electronic signatures or electronic records. Rather, it gives the parties the option to enter freely into online contracts and agreements. Many individuals do not have Internet access or do not understand or choose to use electronic authentication technologies with which they are unfamiliar. Nothing in H.R. 1714 should be interpreted as requiring parties to consent to or use electronic signatures or electronic records if they choose not to.

*Section 102. Authority to alter or supersede general rule*

Section 102(a) provides that a State statute, regulation or other rule of law enacted or adopted after the date of enactment of H.R. 1714 may modify, limit, or supersede the provisions of section 101 (except as provided in section 102(b)) if that State action: (1) is an adoption or enactment of the UETA as reported by the NCCUSL or specifies alternative procedures or requirements recognizing the legal effect, validity and enforceability of electronic signatures, and (2) is enacted by a State within four years after the date of enactment of H.R. 1714; and (3) makes specific reference to the provisions of section 101.

The Committee believes that the four year time frame will provide States with the opportunity and the incentive to adopt UETA or another legal framework for the acceptance of electronic signatures. The forty-three State legislatures that meet annually will have four sessions to enact UETA while the remaining seven State legislatures that meet biennially will have two sessions to enact UETA.

Section 102(b) provides that no State statute, regulation, or rule of law (including those pertaining to insurance), regardless of date of enactment, that modifies, limits, or supersedes section 101 shall be effective to the extent that such statute, regulation, or rule of law: (1) discriminates in favor of or against a specific technology, method, or technique; (2) discriminates in favor of or against a specific type or size of entity engaged in the business of facilitating the use of electronic signatures and electronic records; (3) is based on procedures or requirements that are not specific and that are not publicly available; and (4) is otherwise inconsistent with the provi-

15

sions of section 101. Subsection (b)(3) requires States to provide specific, unambiguous, and transparent requirements for the use and acceptance of electronic signatures. Further, the Committee intends that subsection (b)(4) be read with a degree of reason. This provision is intended to prevent a State from enacting a statute that violates section 101, such as denying legal validity for electronic signatures, but does not limit the ability of States to modify or supersede section 101.

Section 102(c) provides the Secretary of Commerce (the Secretary) the authority to bring an action to enjoin the enforcement of a State statute, regulation, or rule that was enacted in violation of section 102(b). The Committee expects the Secretary to use this authority as necessary, especially in instances where smaller companies are unable to legally challenge a poorly tailored or potentially harmful State law. The Secretary's failure to use such authority in a particular instance should not be construed as validating a State statute, regulation, or rule of law being challenged on the grounds that it violates section 102. The Secretary's lack of action may be due to many reasons that should not prejudice a case for or against the validity of a particular State statute, regulation, or other rule of law.

The Committee wishes to emphasize that nothing in section 102 preempts any State consumer protection law or in any way inhibits or prevents a State from taking action to protect consumers against fraud, forgery, or any unfair or deceptive practices.

*Section 103. Specific exclusions*

Section 103 excludes from the application of section 101 any statute, regulation, or other rule of law governing: (1) the creation and execution of wills, codicils, or testamentary trusts; or (2) adoption, divorce, or other matters of family law.

*Section 104. Definitions*

Section 104 defines the following terms: "electronic record", "electronic signature", "electronic" and "electronic agent". The Committee intends that the definition of electronic signature cover a broad range of electronic signature technologies that can be used to sign an electronic record. This includes, but is not limited to, digital signature technology, a personal identification number (PIN), biometric technologies (such as fingerprints, iris scans, or signature dynamics), and any new electronic signature technologies that may be developed or used in the future.

The definition of electronic signature clarifies that a contract or agreement signed or affirmed by an electronic signature will be afforded the same legal recognition whether signed by a person or electronic agent. A contract or agreement electronically signed by an electronic agent may not be denied legal effect because it was formed by the interaction of electronic agents of the parties, or by the interaction of an electronic agent of a party and an individual acting on the individual's own behalf, or on behalf of another person who is party to the transaction. The Committee believes that by ensuring that contracts and agreements formed through the use of electronic agents are not denied legal effect, section 104(2) seeks to facilitate the growth and development of electronic commerce.

16

## TITLE II—DEVELOPMENT AND ADOPTION OF ELECTRONIC SIGNATURE PRODUCTS AND SERVICES

*Section 201. Treatment of electronic signatures in interstate and foreign commerce*

Section 201(a) directs the Secretary of Commerce, acting through the Assistant Secretary for Communications and Information, to conduct an annual inquiry identifying: (1) any domestic or foreign impediments to commerce in electronic signature products and services and the manner and extent to which such impediments inhibit the development of interstate and foreign commerce; (2) constraints imposed by foreign nations or international organizations that constitute barriers to providers of electronic signature products and services; and (3) the degree to which other nations and international organizations are complying with the principles in section 201(b)(2). Under subsection (a)(2), the Secretary is required to report to Congress the findings of each inquiry 90 days after completion of such inquiry.

Section 201(b) directs the Secretary of Commerce, acting through the Assistant Secretary for Communications and Information, to promote the acceptance and use of electronic signatures on an international basis in accordance with section 101 of the bill and with the principles listed below. In addition, the Secretary of Commerce is directed to take all actions to eliminate or reduce impediments to commerce in electronic signatures, including those resulting from the inquiries required pursuant to subsection (a).

The principles are as follows:

1. Free-markets and self-regulation, rather than government standard-setting or rules, should govern the development and use of electronic signatures and electronic records.

2. Neutrality and nondiscrimination should be observed among providers of and technologies for electronic records and electronic signatures.

3. Parties to a transaction should be allowed to establish requirements regarding the use of electronic records and electronic signatures acceptable to the parties.

4. Parties to a transaction should be permitted to determine the appropriate authentication technologies and implementation for their transactions with the assurance that the technology and implementation will be recognized and enforced. Further, the parties should have the opportunity to prove in court that their authentication approaches and transactions are valid.

5. Electronic records and signatures in a form acceptable to the parties should not be denied legal effect, validity, or enforceability because they are not in writing.

6. De jure or de facto imposition of electronic signature and electronic record standards on the private sector through foreign adoption of regulations or policies should be avoided.

7. Paper-based obstacles to electronic transactions should be removed.

In light of the consideration and adoption by foreign governments of electronic signature legislation which runs contrary to the principles of electronic signatures widely accepted in the United States, the Committee believes that it is critically important for the United

17

States to promote American principles on electronic signatures internationally. A highly regulatory structure for electronic signatures, or the refusal to provide mutual recognition of alternate electronic signature regimes, will hinder the development of global electronic commerce. The Committee is also concerned that such laws will create barriers to American companies providing electronic signature technologies or services in foreign countries.

Section 201(c) directs the Secretary of Commerce, acting through the Assistant Secretary for Communications and Information, to submit a report to Congress, within five years after the date of enactment of the bill, regarding any State statute, regulation, or rule of law enacted or adopted after enactment on the extent to which such statute, regulation, or rule of law complies with section 102(b). Subsection (c) also requires the Secretary to include in the report the actions taken pursuant to section 102(c) and subsection (b).

Section 201(d) requires the Secretary of Commerce to consult with users and providers of electronic signatures and products and other interested parties in carrying out actions under this section.

Section 201(e) clarifies that nothing requires the Secretary or Assistant Secretary to take any action that would adversely affect the privacy of consumers.

Section 201(f) provides that the definitions in section 104 apply to this title.

## TITLE III—USE OF ELECTRONIC RECORDS AND SIGNATURES UNDER FEDERAL SECURITIES LAW

### Section 301. General validity of electronic records and signatures

Title III of the bill amends section 3 of the Securities Exchange Act of 1934 (the Exchange Act) to add a new subsection (h), "References to Written Records and Signatures." In general, subsection (h) provides that a contract, agreement, or record that is required by the Federal securities laws, and is required by any other Federal or State provision to be in writing or to be signed, shall not be denied legal effect, validity, or enforceability on the ground that it is not in writing if it is an electronic record or on the ground that it is not signed or affirmed by a signature if it is signed or affirmed by an electronic signature. The Committee intends that this subsection preempt State law to the contrary. The Committee notes that the purpose of this bill is to facilitate commerce in the "information age," and not to interfere with legitimate regulatory requirements. Title III is not intended to affect the Securities and Exchange Commission's (the Commission's) regulatory recordkeeping requirements, such as ensuring the accuracy of, and access to, electronic records of securities firms. This legislation does not change any existing Federal or State statute or rule requiring the production of records to regulators.

Paragraph (1) provides for general rules of validity for electronic records and signatures in the securities context. Subparagraphs (A) and (B) apply to documents required under the Federal securities laws. Specifically, if a contract, agreement, or record (as defined by section 3(a)(37) of the Exchange Act) that is required by the securities laws is also required by other Federal or State statute, regula-

18

tion, or other rule of law to be in writing or to be signed, the legal effect, validity, or enforceability of such contract, agreement, or record shall not be denied on the ground that the contract, agreement, or record is an electronic record or is signed or affirmed by an electronic signature.

Subparagraph (C) relates to other documents that may be used in securities transactions but arise out of commercial practice or custom rather than a Federal securities law requirement. Specifically, if a broker, dealer, transfer agent, investment adviser, or investment company enters into a contract or agreement with, or accepts a record from, a customer or other counterparty, such broker, dealer, transfer agent, investment adviser, or investment company may accept and rely upon an electronic signature on such contract, agreement, or record, and such electronic signature shall not be denied legal effect, validity, or enforceability because it is an electronic signature.

Paragraph (2) provides for the implementation of the law. The paragraph gives the Commission authority to prescribe rules, if necessary, to effect this subsection, consistent with the public interest and the protection of investors. The Committee notes that this paragraph authorizes, but does not require, the Commission to prescribe regulations in this area. Paragraph (2) further defines the parameters for any rulemaking the Commission should undertake pursuant to this subsection. It requires that such rules must not discriminate in favor of or against (1) a specific technology, method, or technique of creating, storing, generating, receiving, communicating, or authenticating electronic records or electronic signatures; or (2) a specific type or size of entity engaged in the business of facilitating the use of electronic records or electronic signatures. These parameters are subject, however, to the exceptions of paragraph (3).

Paragraph (3) provides for certain exceptions. The first exception, in subparagraph (A), permits the Commission, appropriate regulatory agencies, and self-regulatory organizations (SROs) to require that records that are to be submitted to the Commission, a regulatory agency, or an SRO be filed in a specified electronic format. The exception provided in subparagraph (A) is designed to preserve the existing ability of these entities to "discriminate," notwithstanding the prohibition of paragraph (2) against discrimination, by requiring particular software or other electronic formats for documents that are submitted to them for filing. The term "electronic format" is not defined in the statute; the Committee intends this term to be interpreted flexibly to maximize the ability of the Commission and SROs to specify the technical formatting and similar requirements for materials that are filed with them. The Committee expects that the SEC will use this exception consistent with the legislation's general goal to promote and facilitate the use of electronic, rather than written, mechanisms of commerce.

For example, under this provision, the Commission or SROs could: (1) continue to maintain filing requirements that specify particular software formats, such as the formats required under the EDGAR system or the central registration depository for broker-dealers, without change; (2) specify certain types of security features (such as access codes, passwords, back-up paper copies or dig-

19

ital signatures) that must be incorporated into filings; (3) include
"tagging" requirements to facilitate automated processing of filings;
(4) limit the permitted types of formats acceptable for filing, in
order to facilitate making information available to the public; or (5)
require or prohibit the use of other technological filing means, such
as electronic transmission, magnetic tape, diskettes, CD–ROMs,
video cassette, streamed video, and graphics. This list is meant to
be illustrative, rather than exhaustive; the Committee provides
this list of examples of the discretion retained by the Commission
and SROs under the legislation only to illustrate the broad range
of authority the provision is designed to preserve for the Commis-
sion and SROs for materials that are submitted to them for filing.

Subparagraph (B) of paragraph (3) preserves the authority of the
Commission to require manual signatures for contracts, agree-
ments, or records relating to purchases and sales, or establishing
accounts for conducting purchases and sales, of penny stocks or
similar securities, if the Commission determines that those securi-
ties are susceptible to fraud and that such fraud would be deterred
or prevented by requiring manual signatures. Thus, the Commis-
sion's existing rules requiring manual signatures in connection
with certain of its penny stock rules continue unchanged after en-
actment of this bill. See SEC Release No. 33–7288, n.50 (May 9,
1996).

Paragraph (4) establishes the relationship between title I and
title III of the bill. To avoid overlap, the bill provides that con-
tracts, agreements, or records required by the securities laws are
governed exclusively by the provisions of title III. This paragraph
ensures that any State statute, regulation, or other rule of law en-
acted or adopted after the date of enactment of this bill (including
the UETA) will not modify, limit, or supersede the provisions of
title III for contracts, agreements, or records required by the secu-
rities laws.

Paragraph (5) provides the definitions for certain terms that are
not otherwise defined in the Exchange Act. These definitions are
for purposes of section 3(h) only and are not generally applicable
to the Exchange Act or other Federal securities laws or the rules
promulgated thereunder.

The term "electronic record" is defined to mean a writing, docu-
ment, or other record created, stored, generated, received, or com-
municated by electronic means.

The term "electronic signature" is defined to mean information or
data in electronic form, attached to or logically associated with an
electronic record, that is intended by a party to signify agreement
to a contract or agreement.

Finally, the term "electronic" is defined to mean of or relating to
technology having electrical, digital, magnetic, optical, electro-
magnetic, or similar capabilities regardless of medium.

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3(e) of rule XIII of the Rules of the
House of Representatives, changes in existing law made by the bill,
as reported, are shown as follows (existing law proposed to be omit-
ted is enclosed in black brackets, new matter is printed in italic,
existing law in which no change is proposed is shown in roman):

20

# SECTION 3 OF THE SECURITIES EXCHANGE ACT OF 1934

DEFINITIONS AND APPLICATION OF TITLE

SEC. 3. (a) * * *

 *         *         *         *         *         *         *

*(h) REFERENCES TO WRITTEN RECORDS AND SIGNATURES.—*

*(1) GENERAL VALIDITY OF ELECTRONIC RECORDS AND SIGNA-
TURES.—Except as otherwise provided in this subsection—*

*(A) if a contract, agreement, or record (as defined in sub-
section (a)(37)) is required by the securities laws or any rule
or regulation thereunder (including a rule or regulation of
a self-regulatory organization), and is required by other
Federal or State statute, regulation, or other rule of law to
be in writing, the legal effect, validity, or enforceability of
such contract, agreement, or record shall not be denied on
the ground that the contract, agreement, or record is not in
writing if the contract, agreement, or record is an electronic
record;*

*(B) if a contract, agreement, or record is required by the
securities laws or any rule or regulation thereunder (in-
cluding a rule or regulation of a self-regulatory organiza-
tion), and is required by other Federal or State statute, reg-
ulation, or other rule of law to be signed, the legal effect,
validity, or enforceability of such contract, agreement, or
record shall not be denied on the ground that such con-
tract, agreement, or record is not signed or is not affirmed
by a signature if the contract, agreement, or record is
signed or affirmed by an electronic signature; and*

*(C) if a broker, dealer, transfer agent, investment adviser,
or investment company enters into a contract or agreement
with, or accepts a record from, a customer or other
counterparty, such broker, dealer, transfer agent, invest-
ment adviser, or investment company may accept and rely
upon an electronic signature on such contract, agreement,
or record, and such electronic signature shall not be denied
legal effect, validity, or enforceability because it is an elec-
tronic signature.*

*(2) IMPLEMENTATION.—*

*(A) REGULATIONS.—The Commission may prescribe such
regulations as may be necessary to carry out this subsection
consistent with the public interest and the protection of in-
vestors.*

*(B) NONDISCRIMINATION.—The regulations prescribed by
the Commission under subparagraph (A) shall not—*

*(i) discriminate in favor of or against a specific tech-
nology, method, or technique of creating, storing, gener-
ating, receiving, communicating, or authenticating
electronic records or electronic signatures; or*

*(ii) discriminate in favor of or against a specific type
or size of entity engaged in the business of facilitating
the use of electronic records or electronic signatures.*

*(3) EXCEPTIONS.—Notwithstanding any other provision of
this subsection—*

21

(A) the Commission, an appropriate regulatory agency, or a self-regulatory organization may require that records be filed in a specified electronic format or formats if the records are required to be submitted to the Commission, an appropriate regulatory agency, or a self-regulatory organization, respectively; and

(B) the Commission may require that contracts, agreements, or records relating to purchases and sales, or establishing accounts for conducting purchases and sales, of penny stocks be manually signed, and may require such manual signatures with respect to transactions in similar securities if the Commission determines that such securities are susceptible to fraud and that such fraud would be deterred or prevented by requiring manual signatures.

(4) RELATION TO OTHER LAW.—The provisions of this subsection apply in lieu of the provisions of title I of the Electronic Signatures in Global and National Commerce Act to a contract, agreement, or record (as defined in subsection (a)(37)) that is required by the securities laws.

(5) DEFINITIONS.—As used in this subsection:

(A) ELECTRONIC RECORD.—The term "electronic record" means a writing, document, or other record created, stored, generated, received, or communicated by electronic means.

(B) ELECTRONIC SIGNATURE.—The term "electronic signature" means information or data in electronic form, attached to or logically associated with an electronic record, that is intended by a party to signify agreement to a contract or agreement.

(C) ELECTRONIC.—The term "electronic" means of or relating to technology having electrical, digital, magnetic, optical, electromagnetic, or similar capabilities regardless of medium.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 8



**US CODE COLLECTION**



collection home

search

TITLE 1 > CHAPTER 2 > Sec. 112.

Prev | Next

## Sec. 112. - Statutes at Large; contents; admissibility in evidence

The Archivist of the United States shall cause to be compiled, edited, indexed, and published, the United States Statutes at Large, which shall contain all the laws and concurrent resolutions enacted during each regular session of Congress; all proclamations by the President in the numbered series issued since the date of the adjournment of the regular session of Congress next preceding; and also any amendments to the Constitution of the United States proposed or ratified pursuant to article V thereof since that date, together with the certificate of the Archivist of the United States issued in compliance with the provision contained in section 106b of this title. In the event of an extra session of Congress, the Archivist of the United States shall cause all the laws and concurrent resolutions enacted during said extra session to be consolidated with, and published as part of, the contents of the volume for the next regular session. The United States Statutes at Large shall be legal evidence of laws, concurrent resolutions, treaties, international agreements other than treaties, proclamations by the President, and proposed or ratified amendments to the Constitution of the United States therein contained, in all the courts of the United States, the several States, and the Territories and insular possessions of the United States.

Search this title:

Search Title 1

Notes
Updates
Parallel authorities (CFR)
Topical references

Prev | Next

© copyright          about us          send email

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 9

# UNITED
# STATES
# CODE
# ANNOTATED

### TITLE 15

### Commerce and Trade

### §§ 1681 to 1691f



THOMSON REUTERS



Mat #42570879

JAN 1 2 2021



e forms of activity that indicate
ntity theft.

required by paragraph (1)(A),
graph (1) shall consider in-
oviding that when a transac-
redit or deposit account that
n 2 years, the creditor or
reasonable policies and pro-
be given to a consumer in
o reduce the likelihood of
ccount.

rements

agraph (1) shall not be
edures required under

tor"—

ection 1691a of this
course of business—

rts, directly or indi-
ransaction;

onsumer reporting
-2 of this title, in

a person, based
y the funds or
d by or on behalf

subparagraph
erson for ex-
e creditor to

fined in that
ed in para-
determine
ased on a
tains ac-
e risk of

**(f) Prohibition on sale or transfer of debt caused by identity theft**

### (1) In general

No person shall sell, transfer for consideration, or place for collection a debt that such person has been notified under section 1681c–2 of this title has resulted from identity theft.

### (2) Applicability

The prohibitions of this subsection shall apply to all persons collecting a debt described in paragraph (1) after the date of a notification under paragraph (1).

### (3) Rule of construction

Nothing in this subsection shall be construed to prohibit—

**(A)** the repurchase of a debt in any case in which the assignee of the debt requires such repurchase because the debt has resulted from identity theft;

**(B)** the securitization of a debt or the pledging of a portfolio of debt as collateral in connection with a borrowing; or

**(C)** the transfer of debt as a result of a merger, acquisition, purchase and assumption transaction, or transfer of substantially all of the assets of an entity.

**(g) Debt collector communications concerning identity theft**

If a person acting as a debt collector (as that term is defined in subchapter V) on behalf of a third party that is a creditor or other user of a consumer report is notified that any information relating to a debt that the person is attempting to collect may be fraudulent or may be the result of identity theft, that person shall—

**(1)** notify the third party that the information may be fraudulent or may be the result of identity theft; and

**(2)** upon request of the consumer to whom the debt purportedly relates, provide to the consumer all information to which the consumer would otherwise be entitled if the consumer were not a victim of identity theft, but wished to dispute the debt under provisions of law applicable to that person.

**(h) Duties of users in certain credit transactions**

### (1) In general

Subject to rules prescribed as provided in paragraph (6), if any person uses a consumer report in connection with an application for, or a grant, extension, or other provision of, credit on material terms that are materially less favorable than the most favorable terms available to a substantial proportion of consum-

315

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit B

| Form **14039** (September 2021) | Department of the Treasury - Internal Revenue Service **Identity Theft Affidavit** | OMB Number 1545-2139 |
|---|---|---|

This affidavit is for victims of identity theft. Do not use this form if you have already filed a Form 14039.

The IRS process for assisting victims selecting Section B, Box 1 below is explained at irs.gov/victimsassistance.

Get an IP PIN: We encourage everyone to opt-in to the Identity Protection Personal Identification Number (IP PIN) program. If you don't have an IP PIN you can get one by going to irs.gov/ippin. If unable to do so online, you may schedule an appointment at your closest Taxpayer Assistance Center by calling (844-545-5640). Or, if eligible you may use IRS Form 15227 to apply for an IP PIN by mail or FAX.

**Section A – Check the following boxes in this section that apply to the specific situation you are reporting** *(Required for all filers)*

1. I am submitting this Form 14039 for myself

2. This Form 14039 is submitted in response to a 'Notice' or 'Letter' received from the IRS
   * Please provide 'Notice' or 'Letter' number(s) on the **line to the right**:
   * Please check box 1 in **Section B** and see special mailing and faxing instructions on reverse side of this form.

3. I am submitting this Form 14039 on behalf of my 'dependent child or dependent relative'.
   * Please complete **Section E** on reverse side of this form.

4. I am submitting this Form 14039 on behalf of another person *(other than my dependent child or dependent relative)*.
   * Please complete **Section E** on reverse side of this form.

**Section B – Reason For Filing This Form** *(Required)*

Check only ONE of the following boxes that apply to the person listed in **Section C** below. If the taxpayer in 'Section C' has previously submitted a Form 14039 to the IRS on the same affected tax year(s), there's no need to submit another Form 14039.

1. **Someone used my information to file taxes, including being incorrectly claimed as a dependent**

2. **I don't know if someone used my information to file taxes, but I'm a victim of identity theft**

Please provide an explanation of the identity theft issue, how it is related to your tax account, how you became aware of it and provide relevant dates. If needed, attach additional information and/or pages to this form.

Jeffrey J. Gway & Lillian O. Gway victims of a financial identity theft/prohibition scheme affecting my tax records. It is a clear violation of tax evasion pursuant to IRC 7201 &7206. These false recorded documents was used to pledge our signatures electronically without our consent. This was a violation of Title 15 U.S.C Chapter 96 section 7003a. Dates of events: on 6/24/2019 Corporate Assignment of Deed of Trust. On 11/15/2021 Assignment of Deed of Trust. On 6/23/2022 Notice of Default. On 9/28/2022 Notice of Trustee Sale. On June 6, 2003 Gway Family only signed a contract with Quicken Loans Inc. Names ID Criminals: Ercilia Green VP, Mark T. Waterman VP, Rick Mroczek, TSO, Michael Busby TSO.

**Section C – Name and Contact Information of Identity Theft Victim** *(Required)*

| Victim's last name Gway | First name Jeffrey | Middle initial J | Taxpayer Identification Number *(Please provide 9-digit Social Security Number)* XXX-XXX-XXXX |
|---|---|---|---|

Current mailing address *(apartment or suite number and street, or P.O. Box)* If deceased, please provide last known address
5804 Turquoise Ave

| Current City Rancho Cucamonga | | State CA | ZIP Code 91701 |
|---|---|---|---|

| Tax Year(s) you experienced identity theft *(If not known, enter 'Unknown' in one box below)* | | | What is the last year you filed a return 2021 |
|---|---|---|---|
| 2019 | 2021 | 2022 | |

| Address used on the last filed tax return *(If different than 'Current')* | | Names used on last filed tax return *(If different than 'Current')* | |
|---|---|---|---|

| City *(on last tax return filed)* | | State | ZIP Code |
|---|---|---|---|

| Telephone number with area code *(Optional)* If deceased, please indicate 'Deceased' | | | Best time(s) to call 7 AM-11 AM |
|---|---|---|---|
| Home telephone number | Cell phone number | (000)-418-0102 | |

Language in which you would like to be contacted:   English    Spanish

**Section D – Penalty of Perjury Statement and Signature** *(Required)*

Under penalty of perjury, I declare that, to the best of my knowledge and belief, the information entered on this Form 14039 is true, correct, complete, and made in good faith.

| Signature of taxpayer, or representative, conservator, parent or guardian Jeffrey J Gway | Date Signed 12/12/2022 |
|---|---|

Submit this completed form to either the mailing address **or** the FAX number provided on the reverse side of this form.

Catalog Number 52525A          www.irs.gov          Form **14039** (Rev. 12-2020)

**Section E – Representative, Conservator, Parent or Guardian Information** *(Required if completing Form 14039 on someone else's behalf)*

Check only **ONE** of the following five boxes next to the reason you are submitting this form

1. **The taxpayer is deceased and I am the surviving spouse.**
   * No attachments are required, including death certificate.

2. **The taxpayer is deceased and I am the court-appointed or certified personal representative.**
   * Attach a copy of the court certificate showing your appointment.

3. **The taxpayer is deceased and a court-appointed or certified personal representative has not been appointed.** Attach a copy of death certificate or formal notification from a government office informing next of kin of the decedent's death.
   * Attach a copy of death certificate or formal notification from a government office informing next of kin of the decedent's death.
   * Indicate your relationship to decedent --> ☐ Child   ☐ Parent/Legal Guardian   ☐ Other

4. **The taxpayer is unable to complete this form and I am the appointed conservator or have Power of Attorney/Declaration of Representative authorization per IRS Form 2848**
   * Attach a copy of documentation showing your appointment as conservator or POA authorization.
   * If you have an IRS issued **Centralized Authorization File (CAF)** number, enter the nine-digit number:
     ☐☐☐☐☐☐☐☐☐

5. **The person is my dependent child or my dependent relative.**
   By checking this box and signing below you are indicating that you are an authorized representative, as parent, guardian or legal guardian, to file a legal document on the dependent's behalf.
   * Indicate your relationship to person:   ☐ Parent/Legal Guardian   ☐ Fiduciary Relationship per IRS Form 56   ☐ Power of Attorney
     ☐ Other :

**Representative's Information**

| Last name: | First name: | Middle name: |
|---|---|---|

Representative's current mailing address *(City, town or post office, state, and ZIP code)*

Representative's telephone number

**Instructions for Submitting this Form**

Submit this completed and signed form to the IRS via Mail or FAX to specialized IRS processing areas dedicated to assist you. **In Section C of this form, be sure to include the Social Security Number in the 'Taxpayer Identification Number' field. Help us avoid delays:**

* Choose one method of submitting this form either by Mail or by FAX, not both.
* Please provide clear and readable photocopies of any additional information you may choose to provide.
* Note that 'tax returns' may not be submitted to either the mailing address or FAX number.

| Submitting by Mail | Submitting by FAX |
|---|---|
| • **If you checked Box 1 in Section B** in response to a notice or letter received from the IRS, return this form and if possible, a copy of the notice or letter to the **address contained in the notice or letter.** | • **If you checked Box 1 in Section B of Form 14039** and are submitting this form in response to a notice or letter received from the IRS. If it provides a FAX number, you should send there. |
| • **If you checked Box 1 in Section B of Form 14039,** are unable to file your tax return **electronically** because the primary and/or secondary SSN was misused, attach this Form 14039 to the back of your paper tax return and submit to the IRS location where you normally file your tax return. | If no FAX number is shown on the notice or letter, please follow the mailing instructions on the notice or letter. |
| • If you have already filed your paper return, please submit this Form 14039 to the IRS location where you normally file. Refer to the 'Where Do You File' section of your return instructions or visit IRS.gov and input the search term 'Where to File'. | • Include a cover sheet marked 'Confidential'. |
| • **If you checked Box 2 in Section B of Form 14039** (no current tax-related issue), mail this form to: | • If you checked Box 2 in Section B of Form 14039 (no current tax-related issue), FAX this form toll-free to:  **855-807-5720** |

Department of the Treasury
Internal Revenue Service
Fresno, CA 93888-0025

**Privacy Act and Paperwork Reduction Notice**

Our legal authority to request the information is 26 U.S.C. 6001. The primary purpose of the form is to provide a method of reporting identity theft issues to the IRS so that the IRS may document situations where individuals are or may be victims of identity theft. Additional purposes include the use in the determination of proper tax liability and to relieve taxpayer burden. The information may be disclosed only as provided by 26 U.S.C. 6103. Providing the information on this form is voluntary. However, if you do not provide the information it may be more difficult to assist you in resolving your identity theft issue. If you are not a potential victim of identity theft and do not provide the required substantiation information, we may not be able to place a marker on your account to assist with future protection. If you are a victim of identity theft and do not provide the required information, it may be difficult for IRS to determine your correct tax liability. If you intentionally provide false information, you may be subject to criminal penalties. You are not required to provide the information requested on a form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. Generally, tax returns and return information are confidential, as required by section 6103. Public reporting burden for this collection of information is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have comments concerning the accuracy of these time estimates or suggestions for making this form simpler, we would be happy to hear from you. You can write to the Internal Revenue Service, Tax Products Coordinating Committee, SE:W:CAR:MP:T:T:SP, 1111 Constitution Ave. NW, IR-6526, Washington, DC 20224. Do not send this form to this address. Instead, see the form for filing instructions. Notwithstanding any other provision of the law, no person is required to respond to, nor shall any person be subject to a penalty for failure to comply with, a collection of information subject to the requirements of the Paperwork Reduction Act, unless that collection of information displays a currently valid OMB Control Number.

Catalog Number 52525A                    www.irs.gov                    Form **14039** (Rev. 12-2020)